UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas RETTIG, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Gary NOWAK, Defendant-Appellant.

Nos. 76–1407, 76–1963.

United States Court of Appeals,
Ninth Circuit.

Oct. 17, 1978.

As Amended Nov. 27, 1978.

Rehearing Denied Jan. 25, 1979.

John J. Cleary (argued), San Diego, Cal., Robert C. Moest (argued), Los Angeles, Cal., for defendants-appellants.

Ronald L. Gallant, Asst. U. S. Atty. (argued), Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS, CUMMINGS * and KENNEDY, Circuit Judges.

KENNEDY, Circuit Judge:

Rettig and Nowak appeal from judgments of conviction entered after a jury found them guilty of multiple conspiracies to import cocaine and to possess cocaine

---

* Honorable Walter J. Cummings, United States Circuit Judge for the Seventh Circuit, sitting by designation.

with intent to distribute. 21 U.S.C. §§ 841(a)(1), 846, 952, 960, 963. We reverse the convictions of both appellants.

The indictment charged that on several occasions Rettig or Nowak or both went to Lima, Peru, purchased cocaine from a Peruvian source, and then gave the cocaine to hired couriers to carry back to the United States by various clandestine methods. Witnesses for the Government testified that Rettig and Nowak originated the scheme and financed it. In addition to this testimony, the Government built its case in substantial part on evidence seized from Rettig's residence at Morro Bay, California. The question on this appeal is whether or not that evidence was discovered by a lawful search.

The search of the residence purportedly was executed pursuant to a search warrant issued by a state judge on April 3, 1975, but a full understanding of the circumstances of the case requires consideration of the events of the preceding day. On April 2 Drug Enforcement Agency agents asked a federal magistrate in Los Angeles to issue an arrest warrant for Rettig on the cocaine importation charges and also requested a search warrant directed to his Morro Bay residence. The magistrate issued the arrest warrant, but declined to issue the search warrant, finding that the information the agents adduced was stale.

The agents executed the arrest warrant the following day, April 3, and added a ruse. DEA agents and local police covered all the exits from the house while one agent made an anonymous telephone call "warning" Rettig that federal officers were on the way with an arrest warrant *and* a search warrant. The agents hoped that Rettig would attempt to flee with evidence linking him to the cocaine charges and that in this way they could seize material that might otherwise be secreted and obtainable only by a search warrant. After an agent notified his colleagues by radio that he had made the call to Rettig, agent Kuehl went to the front door of the residence, knocked, and announced his purpose to execute the arrest warrant. Receiving no response, he entered the house by force and went to the second floor. There he found Rettig in the bathroom attempting to flush approximately one pound of marijuana down the toilet. Rettig was taken into custody. Some of the agents remained on the premises while another made a second attempt to obtain a search warrant for the house.

■ This time the agent went to a state court judge. The affidavit for the search warrant stated that the purpose for its issuance was to discover and seize evidence to support the charge of possession of marijuana. The affidavit mentioned neither the denial of the request for a search warrant on the day before nor any purpose or intent to search for evidence of the cocaine conspiracy. The April 3 affidavit stated simply that Rettig had attempted to dispose of the marijuana when an arrest warrant was executed and gave the details of that incident. The affidavit then continued:

Your affiant has been trained in the identity [sic] and recognition of marijuana substances at the National Training Institute in Washington, D. C., and has observed marijuana during the course of his employment approximately 50 times. Your affiant knows through his training and experience that commonly persons who have possession of marijuana will have other quantities secreted in various locations in their residence. Your affiant also knows from his training that persons who possess marijuana often have paraphernalia for the use of marijuana, such as cigarette rolling machines, papers, wax paper, plastic bags, scales, and measuring devices. Your affiant also knows that persons in possession of a residence will normally have indicia of their identity located within said residence including, but not limited to, cancelled mail, keys, rent receipts, deeds, leases, bills, passport and photographs.

Based upon the information contained in this affidavit the state judge issued a search warrant. It described the Morro Bay residence and appurtenant structures and further described the following personal property as subject to seizure:

Marijuana and marijuana substances, paraphernalia for the use of marijuana, such as cigarette rolling machines, papers, wax paper, plastic bags, scales and measuring devices. Indicia of the identity of the residents of said house including, but not limited to, cancelled mail, keys, rent receipts, utility bills, deeds, leases and photographs.

Immediately after the search warrant was issued, an agent returned with it to the house where other agents were waiting. Five or six agents then conducted an extensive search. The agents' estimate of the duration of the search varied from one hour to five and one-half hours. Documents and papers throughout the house were examined, ostensibly to discover indicia of the residents' identity for the purpose set forth in the warrant. The Government stipulated to a complete inventory of the material taken, which lists some 2,288 items. The vast majority of the items listed are written material. While the list is too extensive for a detailed description here, the breadth of the search that took place can be understood by noting that the items seized included numerous United States government publications, blank applications for various credit cards, bank brochures, medical and dental records, drug store receipts for a period extending over two years prior to the search, photograph slides, undeveloped film, extensive financial records, credit cards, and travel documents. Also seized were a black leather case containing approximately four pounds of white powder, a triple beam balance scale, and several wine bottles.

We think that in the hands of these agents the warrant issued on April 3 was used as an instrument for conducting the search for which permission had been denied on the previous day, a search that pertained to evidence of the cocaine charge, not to the possession of marijuana. In contrast to the affidavit filed with the state judge in support of the April 3 search warrant, the affidavit filed the day before with the federal magistrate described in detail, in four pages of single spaced text, the elaborate scheme to smuggle cocaine from Peru, including preliminary flights from California to Lima, Peru by way of New York. The affidavit revealed plans to smuggle cocaine by using hollowed out chess boards, film canisters, false bottom suitcases, and a plan to dissolve cocaine in wine bottles and recover it once it had been imported. The affidavit further recited that during the conspiracy, and at the time of the affidavit, Rettig occupied the Morro Bay residence. The search that was conducted, and the items seized, were more pertinent to these matters than to the marijuana charge, and we conclude that the search was for purposes and objects not disclosed to the magistrate.

Rettig's wife was present at the home during the search and by affidavit described the incident. Portions of her affidavit, uncontradicted in the record, are set forth in the margin.[1] Her statements further

---

1. Mrs. Rettig described the search as follows: DEA Agent Stevens indicated that he wished to start by searching the darkroom that is adjacent to the garage on the first floor of the residence.

.    .    .    .    .

While Agent Stevens was looking in the darkroom, DEA Agent Kuehl was looking in the office that is adjacent to the darkroom and looking through my husband's desk. Agent Stevens then told me to open the file cabinet in the office or he would take a crowbar to open it. I did as he asked. He went through each drawer and took out a passport folder and a file with letters from Fred Marx.

.    .    .    .    .

I went to answer the telephone in the playroom. There I saw one of the sheriffs going through three boxes. After the phone call, I went back to the office and Agent Stevens and Agent Kuehl had a box full of papers, credit cards, a passport, tickets, and other things I didn't get a chance to see. During the next fifteen minutes, Agent Stevens and Agent Kuehl asked me several times, "Where's the cocaine, Darline?" They also asked, "Why don't you just tell us where it is so we don't have to mess up your house."

At approximately 2:45 P.M., Agent Stevens and I went into the playroom. A sheriff was searching there Agent Stevens found a scale on top of the kiln with jewelry equipment. He said, "Well, what do we have here, a triple beam scale."

.    .    .    .    .

support the inference that the agents did not confine their search to a discovery of evidence relating to the marijuana charge and of the identity of the occupants of the house, but that instead they searched for evidence of the far more extensive criminal enterprise to smuggle cocaine.

■ The failure of the agents to advise the state judge on April 3 of the unsuccessful attempt made the day before to obtain a search warrant for evidence of the cocaine conspiracy and of their continued purpose to discover evidence of this complicated scheme would not necessarily invalidate the search warrant or proscribe a search and incident seizures confined to the terms of the warrant. The case before us is to be distinguished from those in which the defendant seeks to attack the factual accuracy of the underlying affidavits in order to establish a warrant's improper issuance. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and cases cited therein. Where factual inaccuracy of the affidavit is alleged, a warrant is invalidated only if it is established that the affiant was guilty of deliberate falsehood or reckless disregard for the truth, and if, with the affidavit's false material set to one side, the information remaining in the affidavit is inadequate to support probable cause. *Id.* 438 U.S. at 156, 171, 98 S.Ct. 2677, 2685. The April 3 warrant was validly issued for the purpose set forth in the affidavit, and there is no contention of an insufficient showing of probable cause to issue the warrant for that purpose. However, the failure to disclose does enlighten our review of the search and seizures that actually took place as we determine whether or not the agents went beyond the confines of the warrant.

■ By failing to advise the judge of all the material facts, including the purpose of the search and its intended scope, the officers deprived him of the opportunity to exercise meaningful supervision over their conduct and to define the proper limits of the warrant. As the Supreme Court has stated, "[t]he bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search." *Id.* 438 U.S. at 164, 98 S.Ct. at 2681. The safeguards of the fourth amendment that a magistrate is charged with upholding consist not only in the guarantee that a search warrant be issued upon probable cause but also in the requirement that any warrant issued be one "particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. Amend. IV. An examination of the books, papers, and personal

Agent Stevens and Agent Kuehl came upstairs where I was on the telephone and asked me to come into our bedroom. I obeyed. They both went to the corner where my husband keeps his books and papers. Agent Stevens got my husband's briefcase and started going through the books and papers on the floor. Agent Stevens decided not to go through the whole briefcase there but take it instead. The agents showed me a valuable tortoise-shell clock and an antique sterling silver cigarette case and asked me to identify them, which I did. They took both items.

. . . . .

DEA Agent Kuehl also found a sealed package next to the side of the bed. He told me to open it. I said, "No." He then grabbed it away from me and said "Then I'll open it." I then agreed to open the package. Agent Kuehl took a letter from it, leaving a tape and a book that was with it.
At around 4:00 P.M. the DEA agents found a black bag with a package of white powder in it labeled, "Mannitol" and some bottles. He said, "Well, two 5 lb. bags of Mannitol and alcohol." I said "So what." At that time Agent Stevens told me that you make cocaine out of it.

. . . . .

When I got to the livingroom I saw one sheriff going through a trunk and one officer going through the kitchen.
I went back into the bedroom and asked if they were through with the stuff in the corner and said that I would like to clean it up a bit. Agent Stevens said to go ahead. Agent Stevens went through our drawers just a little and then left when Agent Kuehl came in with some papers saying, "Here's the whole route they took, it's a complete record." Agent Stevens asked me if we had any empty wine bottles and where they were. I showed them our collection of *many* empty bottles. Agent Stevens asked if we had any wine from Peru.
(Emphasis in original).

possessions in a suspect's residence is an especially sensitive matter, calling for careful exercise of the magistrate's judicial supervision and control. *See Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965).

■ The search warrant issued by the state judge here was not a general warrant on its face. The things to be discovered were described with sufficient particularity. *United States v. Honore*, 450 F.2d 31 (9th Cir. 1971), *cert. denied*, 404 U.S. 1048, 92 S.Ct. 728, 30 L.Ed.2d 740 (1972). *Cf. United States v. Drebin*, 557 F.2d 1316 (9th Cir. 1977) (insufficient guidelines for delineating seizable items), *modified on rehearing as to other issues*, 572 F.2d 215 (9 Cir. 1978), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). The question is whether or not the search that was conducted was confined to the authorization given by the magistrate. In determining whether or not a search is confined to its lawful scope, it is proper to consider both the purpose disclosed in the application for a warrant's issuance and the manner of its execution. *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1975). *Cf. United States v. Dubrofsky*, 581 F.2d 208 (9th Cir. 1978). Had the state judge who issued the search warrant been informed of the true reason for the warrant request and of the scope of the search contemplated, he might have concluded that it was permissible to issue the warrant for the purpose of searching for evidence of the conspiracy here in question, subject to explicit limitations on the scope of discovery and seizure in order to prevent an overly intrusive search. But the agents withheld this information. A judicial officer cannot perform the function of issuing a warrant particularly describing the places to be searched and the things to be seized, and of supervising the proper return of such process, where the police fail to disclose an intent to conduct a search the purposes and dimensions of which are beyond that set forth in the affidavits.

■ It is, of course, not the rule that only evidence uncovered during a search must invariably be described in the warrant before it may be seized. *E. g., United States v. Damitz*, 495 F.2d 50, 56 (9th Cir. 1974). Where evidence is uncovered during a search pursuant to a warrant, the threshold question must be whether the search was confined to the warrant's terms. As the Fifth Circuit has concluded, "[t]he search must be one directed in good faith toward the objects specified in the warrant or for other means and instrumentalities by which the crime charged had been committed. It must not be a general exploratory search . . ." *Gurleski v. United States*, 405 F.2d 253, 258 (5th Cir. 1968), *cert. denied*, 395 U.S. 977, 981, 89 S.Ct. 2127, 2140, 23 L.Ed.2d 765, 769 (1969), *cited with approval in United States v. Honore*, 450 F.2d at 33. We find the record establishes that the agents did not confine their search in good faith to the objects of the warrant, and that while purporting to execute it, they substantially exceeded any reasonable interpretation of its provisions. As interpreted and executed by the agents, this warrant became an instrument for conducting a general search. Under the circumstances, it is not possible for the court to identify after the fact the discrete items of evidence which would have been discovered had the agents kept their search within the bounds permitted by the warrant; and therefore all evidence seized during the search must be suppressed.

■ Appellant Nowak also attacks the district court's holding that he lacked standing to object to the search of Rettig's residence. We disagree with the court below. Nowak filed an affidavit, unchallenged by the Government, that indicated his possessory interest in the residence. Nowak paid one-quarter of the rent for the house, used the address for his driver's license and income tax returns, had a key to the residence and unlimited access thereto, kept articles of personal property there, and stayed there when he was in California. This is sufficient to confer standing despite the fact that Nowak lived elsewhere. *See Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4

L.Ed.2d 697 (1960); *United States v. Burke,* 506 F.2d 1165, 1171 (9th Cir. 1974), *cert. denied,* 421 U.S. 915, 95 S.Ct. 1576, 43 L.Ed.2d 781 (1975).

REVERSED and REMANDED.