**UNITED STATES of America**

v.

**Donald McArthur BELCHER.**

**Crim. No. 83-00073-01-R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 2, 1983.

**1242**

Gregory Welsh, Asst. U.S. Atty., Richmond, Va., for plaintiff.

Lawrence D. Diehl, Petersburg, Va., for defendant.

## OPINION

WARRINER, District Judge.

I

Defendant Belcher has been charged with criminally setting fire to a restaurant in Colonial Heights, Virginia, known as Eaden's Creative Cookery. He has moved to dismiss the indictment since, he claims, the statute, 18 U.S.C. § 844(i),[1] was not offended. The building was closed for repair at the time of the fire and hence, he argues, was not "used in interstate ... commerce." Thus, the threshold question that must be addressed is whether this Court, under the aegis of 18 U.S.C. § 844(i), has subject matter jurisdiction over the arson charged. Although the Anti-Arson Act of 1982 expanded federal jurisdiction from commercial property destroyed by bombings and explosions to include that destroyed by fire, there still remained the restriction that there be a nexus between the property destroyed and interstate or foreign commerce sufficient to create federal jurisdiction.

To defendant's argument the United States responds that a mere hiatus of business or active trade is insufficient to break the nexus of destroyed property to interstate commerce on which federal jurisdiction is grounded. Both parties support their motions by much the same case law, but differ as to its interpretation.

In *United States v. Grossman*, 608 F.2d 534 (4th Cir.1979), the only Fourth Circuit case to treat the jurisdictional reach of 18 U.S.C. § 844(i), two defendants were charged with conspiracy to violate 18 U.S.C. § 844(i). The property they intend-

---

1. The full text of the amended section reads as follows:

   Whoever maliciously damages or destroys, or attempts to damage or destroy by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

ed to destroy, a backhoe, had been manufactured in Iowa, sold and shipped to an equipment company in Virginia, then re-sold and shipped to a North Carolina construction company, whose guarantor on the purchase loan ultimately acquired the equipment. At the time of its destruction, the equipment was not being used in any business whatsoever, but it was the subject of an advertisement for sale in an out-of-State trade newspaper.

Defendant takes the position that whether a building is "used in interstate commerce" depends "on its specific use ... at the time of the fire, rather than the other activities or channels of commerce connected to the building indirectly, such as construction, insurance, etc." Defendant's *Memorandum in Support of Motion to Dismiss Indictment for Lack of Jurisdiction* at p. 4.

Defendant argues that the "multiplicity of facts" presented to the *Grossman* court explains why that court found § 844(i) jurisdiction even though the backhoe was not being used in any sort of commerce at the moment of its destruction. This reasoning is persuasive but unconvincing. Defendant would have a *contemporaneous* connection with interstate commerce as the *sine qua non* of federal jurisdiction. Neither *Grossman* nor the other cases relied upon by defendant support this analysis. Indeed, the Fourth Circuit specifically rejected such a reading of § 844(i):

> Upon appeal, the defendants contend that their convictions are void for lack of jurisdiction since the backhoe which they conspired to destroy was not 'used in interstate ... commerce or in any activity affecting interstate commerce' as required by 18 U.S.C. § 844(i). Specifically, they argue that § 844(i) *requires a contemporaneous connection without regard to past interstate movement.* In this respect, appellants point out that the backhoe had been in the state of North Carolina continuously for two and one-

half years prior to its destruction, and at the time was not being used ... in ... business. [Emphasis added.]

*Grossman,* at 536.

In addressing the question of what is necessary to satisfy the commerce requirement of § 844(i), the court was guided by earlier cases decided by the Seventh and Tenth Circuits[2] and held:

> We are in accord with the conclusion of these circuits that in using the words 'affecting interstate commerce' Congress intended to exercise the full jurisdictional reach constitutionally permissible under the Commerce Clause. See also *Scarborough v. United States,* 431 U.S. 563, 571 [97 S.Ct. 1963, 1967, 52 L.Ed.2d 582] ... (1977).

> With the statutory breadth of § 844(i) in mind, we are of the opinion that the evidence in this case demonstrated a sufficient interstate nexus. As we have noted, the backhoe had been manufactured in Iowa and owned by two companies in Virginia prior to its shipment into North Carolina and was being held for sale to 'anybody, anywhere' and advertised to that effect in a periodical published in the State of Tennessee. Accordingly, we hold that the district court properly exercised jurisdiction.

*Grossman,* at 537.

On 13 April 1983, a small kitchen fire had taken place, forcing Eaden's Creative Cookery temporarily to close. There is no indication that the restaurant was permanently discontinuing operations, and hence its connection with interstate commerce, anymore, for example, than there was evidence that the backhoe in *Grossman* was permanently being taken from the commercial stream. Indeed, analogous to that piece of equipment's being offered for sale out-of-State is that the restaurant was being repaired and cleaned in order to re-open as soon as possible.

The question that emerges is this: If contemporaneous connection with inter-

---

**2.** *United States v. Sweet,* 548 F.2d 198 (7th Cir. 1977), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977) and *United States v.* *Schwanke,* 598 F.2d 575 (10th Cir.1979), both of which are discussed *infra.*

state commerce be not requisite, just how many and what kind of connections with interstate commerce are needed to make out an offense under § 844(i)? Useful analysis in reaching an answer is provided in United States v. Mennuti, 487 F.Supp. 539, 543 (E.D.N.Y.1980). Relying on Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the court enumerated three categories of criminal statutes based on commerce clause jurisdiction: 1) those regulating channels of commerce; 2) those regulating things or persons in commerce; and 3) those regulating activities affecting interstate commerce. 18 U.S.C. § 844(i):

> applies only to destruction of interstate property ... with interstate property broadly defined to include property 'used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.'

Applying this categorization of statutes to the holdings of Sweet, Schwanke, and Grossman, the court held that these cases stood for the proposition that:

> (1) § 844(i) exercises the full jurisdictional reach constitutionally permissible under the commerce clause over interstate property; and
>
> (2) § 844(i) extends to any property having a de minimis connection with interstate commerce.

Mennuti, at 544.

The Mennuti court then concluded that a private residence, even though built with interstate materials, financed by interstate banks, and insured by interstate insurance companies, was not within the intendment of § 844(i). It would be inaccurate to suggest that § 844(i) "intends to regulate all explosives [after October, 1982, "fire or an explosive"] having a 'de minimis effect on commerce.'"

On appeal, the Second Circuit, in affirming, explained:

> It would be altogether strained to say that such a dwelling, although not used in commerce is 'used' in an activity affecting commerce. It is not enough under the statute that the quantum of com-

merce might differ if the building had never been built, were destroyed or were rebuilt. The critical word here is 'used.' Congress did not define the crime described in § 844(i) as the explosion of a building whose damage or destruction might affect interstate commerce as we assume it could constitutionally have done. See generally Sterm, "The Commerce Clause Revisited—The Federalization of Intra-State Crime," 15 Ariz.L.Rev. 271 (1973). It chose to require that the damaged or destroyed property must itself have been used in commerce or in an activity affecting commerce.

United States v. Mennuti, 639 F.2d 107, 110 (2nd Cir.1981).

The Court is here faced with a building, commercial, not residential, in use, serving out-of-State alcohol to a chiefly local clientele, and using out-of-State supplies to help carry on this endeavor. As of April, 1983, the restaurant owners had procured an alcoholic beverage license and sold alcoholic beverages produced in other States and brought to Virginia in interstate commerce. In United States v. Sweet, 548 F.2d 198, 200 (7th Cir.1977), cert. denied, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977), the Court addressed the bombing of an admittedly local tavern, not "used in interstate or foreign commerce" and found the tavern's sale of out-of-State alcohol adequate to confer federal jurisdiction because such sale 'affects' interstate commerce. In reaching its decision, the court looked carefully at the legislative history of § 844(i) and quoted from House Report No. 91–1549, Organized Crime Control Act of 1970, 1970 U.S.Code Cong. & Ad.News at pp. 4007, 4046:

> Since the term affecting [interstate or foreign] 'commerce' represents 'the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause,' NLRB v. Reliance Fuel Corp. ... 371 U.S. 224 [83 S.Ct. 312, 9 L.Ed.2d 279] ... (1963), this is a very broad provision covering substantially all business property. While this provision is broad, the committee believes that there is no question that

it is a permissible exercise of Congress' authority to regulate and to protect interstate and foreign commerce.

Relying on this history the court concluded:

> The punishment in § 844(i) of the unlawful use of explosives in an intrastate activity, but which has an effect on interstate commerce although *de minimis*, is within the power of Congress to enact as an appropriate means to accomplish a legitimate end under the commerce power.

*Sweet*, at 202.

In addition to alcohol, the owners of Eaden's Creative Cookery had and used equipment and supplies produced out of State and brought into Virginia in interstate commerce. In *United States v. Schwanke*, 598 F.2d 575, 578 (10th Cir.1979), the court considered destruction of a building, a tenant of which operated a restaurant therein, purchasing vegetables and confections from outside the State, and found jurisdiction under § 844(i) to exist. Citing *Sweet* and the legislative history, the Court held at p. 578:

> Congress has the power to punish the unlawful use of explosives under the Commerce Clause, even though the effect on interstate commerce may be *de minimis*.

In the present case, both the building and the restaurant were insured by an out-of-State company, and an out-of-State company held a mortgage on the property. In *United States v. Barton*, 647 F.2d 224, 232–33 (2nd Cir.1981), the court considered a jury instruction that interstate commerce was affected if a building was insured by a carrier doing business in more than one State and found:

> We are inclined to believe that the mere fact that a building is insured by an interstate carrier does not meet even the *de minimis* standard for showing that the activity of the building affected interstate commerce. In light, however, of the fact that these are jurisdictional, rather than substantive, elements of the government's case and in view of the adequacy of the undisputed evidence as

to the alternative jurisdictional predicates, we conclude that any error in giving the insurance portion of the charge was harmless.

A similar situation obtains in the case at bar. The *Barton* court found its evidence of "alternative jurisdictional predicates" in the fact that coffee and orange juice derived from out-of-State were consumed in the building and that out-of-State fuel was used in heating the building. Here, Eaden's Creative Cookery routinely sold out-of-State alcohol and made use of out-of-State equipment and supplies.

■ It appears, then, that violation of § 844(i) minimally requires destruction of a commercial building wherein a business buys and sells goods passing in interstate commerce. For example, in *United States v. Andrini*, 685 F.2d 1094, 1096 (9th Cir. 1982), the court considered an office building under construction which was destroyed by a deliberately set fire and concluded:

> [W]e have no difficulty finding the jurisdictional nexus here. Cove Development had erected the building's frame and nailed down the plywood subroofing when the office building was deliberately burned. Materials from out of state, including windows, doors, cedar shingles and plywood, were stored at the site. These materials were the inventory of Cove Development .... We therefore hold that the construction of a commercial office building using out-of-state materials is a commercial activity affecting interstate commerce for the purpose of § 844(i).

*A fortiori*, if destruction of an uncompleted office building fits within § 844(i) because the inventory of the construction company originated out of State, then destruction of a restaurant, temporarily undergoing repairs, whose liquor inventory likewise originated out of State, should suffice to give a federal court jurisdiction.

■ Because Eaden's Creative Cookery was a commercial building wherein out-of-State goods were sold, and because under

the authority of *United States v. Grossman*, 608 F.2d 534 (4th Cir.1979), it did not lose that character while temporarily closed, its destruction by arson is an offense under 18 U.S.C. § 844(i).

## II

The more troubling question in this case is raised by defendant's motion to suppress, evidence obtained from a search of defendant's room.[3] The facts developed at an evidentiary hearing disclose that from the time of the fire, Mr. Baxter, a federal ATF agent, and Lt. Sheffield, a police officer of Colonial Heights were very busily engaged in investigating the arson of Eaden's Creative Cookery. They were in daily contact with one another and were devoting a good part of their time to the investigation. Indeed, it appears from the evidence that this was the primary endeavor in which they were engaged during the time in question.

Their investigation revealed the defendant, Mr. Belcher, as a prime suspect in the arson. This determination was made on the basis of circumstantial evidence plus some incriminating statements that were made by Mr. Belcher to the investigators. Among these incriminating statements was one on his part that he had made and, at a previous time, had had in his possession a tape or tapes of a telephone conversation or conversations dealing with the arson. The two officers centered their investigation of the arson on Mr. Belcher and finally determined to arrest Mr. Belcher for the arson offense. It appears conceded that probable cause to arrest existed.

At the time they arrested the defendant, Lt. Sheffield looked into the nearby car of Mr. Belcher, and there in the car saw a stack of paper which he took to be, and had reason to believe were, so-called football cards used in the business of gambling on football games. A subsequent search pursuant to warrant confirmed his belief.

One of the reasons that he had reason to believe they were football cards is that Mr. Belcher was well-known to be a bookmaker. In fact, he had been known to be a bookmaker by Lt. Sheffield for at least thirteen years. Thus, the evidence which Lt. Sheffield glimpsed of gambling was no surprise to him. He learned nothing new about Mr. Belcher's propensity to make book at the time he discovered that Mr. Belcher had football cards in his possession. It was perfectly commonplace for a known bookie to have football cards. The new fact he learned was that at that particular time and place the football cards were in the car.

We have, then, Mr. Belcher, living in the relatively small town of Colonial Heights, well-known there to be a bookie, fair game for a police officer who was attempting to thwart his bookmaking efforts through the application of the criminal law for better than a decade, and Lt. Sheffield, hot on an arson investigation, picked this particular time to obtain a search warrant to find evidence of gambling. He swore out successive warrants to search the car and then Mr. Belcher's room on probable cause to believe that gambling paraphernalia would be found.

Under the facts of this case, having observed the parties as they have answered the questions, and having observed particularly their reluctance and their careful phrasing when it came down to some of the crucial questions, I have concluded that the purported investigation into gambling which occurred when defendant's room was searched was an investigation into arson. The real purpose for the search warrant of the car was to justify a search warrant of the room and the real purpose of the search warrant of the room was to see if arson evidence could be found. In the gambling investigation, they had a vehicle to enter defendant's room, but it was a subterfuge and a pretext for seeking arson evidence against him.

The gambling search warrants were sworn out in conjunction with consultations with the federal arson prosecutor. Though

---

**3.** Defendant lived in a single room in a roominghouse. His reasonable expectation of privacy in that room cannot be doubted. It was his home.

State charges, only, were contemplated in the warrant, federal agent Baxter was intimate with the proceeding both before and after the warrant was issued. He accompanied the State officers to execute the warrant. His sole reason for searching the room was to find evidence against Belcher in the arson case. Indeed the reason Lt. Sheffield obtained and executed the warrant was to obtain the arson evidence. They particularly were looking for, and found, the audio tapes of telephone conversations linking Belcher with the crime. Gambling evidence also was found.

It strains credulity to think that Lt. Sheffield and Mr. Baxter, having devoted the major part of their time since April to an arson investigation, would one evening jointly depart from the arson investigation and run down a small gambling investigation for the purpose of upholding the gambling laws. Their purpose was to try to uphold the arson laws. Both purposes are proper; both uphold the criminal law. But they used one as a pretext for their activities in the other.

Ordinarily, Mr. Baxter would have had no interest in a search warrant for evidence on a small-time bookie in Colonial Heights. He was there for one reason and one reason only: to try to find additional evidence to link Mr. Belcher with the arson. And his hunch that there very likely would be evidence of arson in the room was borne out by the facts.

It is very clear, and not by just a bare preponderance of the evidence, exactly what the officers did. The officers said, "Look, let's get into that room by hook or crook and let's find out if we can find something in there on this arson thing. Let's use these football cards you saw in his car as our vehicle to get in there and search for arson evidence."

The search and the seizure was very thorough. Everything but Belcher's clothes and the room furniture was seized. The agents seized correspondence between Belcher and his son, a dictionary, a photograph of a nude woman. While it must be recognized that even slips of paper may, and often do, constitute evidence of the gambling trade, much of what was seized was not remotely connectable to gambling or, for that matter, to arson.[4]

■ Thus this Court has found as a matter of fact that the search of defendant Belcher's room for gambling paraphernalia was a pretext to gain access to suspected evidence of arson.[5] The question thus presented is whether a search and seizure of such arson evidence without a warrant directed to that end, while proceeding under a procedurally valid, but actually pretextual, search for evidence of gambling violates the Fourth Amendment protection from unreasonable searches.

Both parties agree that the basic law on the issue is found in *Coolidge v. New Hampshire*, 403 U.S. 443, 468–69, 91 S.Ct. 2022, 2039–40, 29 L.Ed.2d 564 (1971) which stands for the proposition that. evidence seized during a warrantless search is admissible only 1) if the police officer has some prior justification for the intrusion and 2) if his discovery is inadvertent. Both parties agree as well that *United States v. Hare*, 589 F.2d 1291 (6th Cir.1979) prohibits a finding of such inadvertence where there was probable cause to believe the evidence would be found in the place to be searched. United States Supplemental Response to Motion to Suppress Evidence at p. 10. This Court, rather than finding there was, or was not, probable cause to search the room for evidence of arson,[6] narrowed the legal

---

4. The foregoing recitation of facts is substantially taken from the transcript of the findings from the bench at the conclusion of the suppression hearing.

5. The Court has considered the prosecution's arguments in brief that the Court has wrongly found the facts. Recognizing that more than one inference may be drawn from the testimo-

ny, the Court is persuaded that the view taken by the Court is compelled by a preponderance of the evidence.

6. I infer that there was probable cause to arrest Belcher since he already had been arrested. As a general proposition the search of the residence of a person charged with a crime might well be expected to turn up something useful to

question to whether a pretextual search, assuming something less than probable cause, violates the Fourth Amendment standards for warrantless searches as articulated by the Supreme Court in *Coolidge*. Stated differently, does Hare's reference to probable cause define the *only* condition supporting advertence.

Defendant first argues that federal ATF agent Baxter had no right to be present at the defendant's automobile or in his apartment during the search and that his illegal presence voids the search for and seizure of arson evidence. Defendant points specifically to Va.Code § 19.2–56 limiting the term "authorized officer," which appeared on the gambling warrant, to "sheriff, sergeant or any policeman of the . . . city in which the place to be searched is located." Given this stricture, defendant cites *United States v. Sanchez*, 509 F.2d 886, 889 (6th Cir.1975) as exemplifying the proposition that an illegal federal presence mandates exclusion of evidence seized.

In *Sanchez*, relying upon the tip of a previously reliable informant, an officer of the Toledo Drug Enforcement Unit drafted a narcotics search warrant for the home of Sanchez. After having secured the warrant, the officer received another call from the same informant advising him there were also explosives at the Sanchez house. The Toledo officer immediately contacted an agent of the federal Alcohol, Tobacco, and Firearms agency, advised him of the explosives, and requested his assistance in the search. Despite the fact that two hours elapsed between the time the federal agent was notified and the time the narcotics warrant was executed, an additional warrant for the explosives was not sought by either local or federal authorities. Shortly after midnight several officers of the Toledo Drug Enforcement Unit accompanied by the ATF agent executed the search warrant at defendant's house. Although no narcotics were found, a footlock-er and a box found in one of the rooms contained some seventy pounds of explosives. The agent was able to identify the explosives as stolen. They were therefore seized, and a federal indictment was issued.

The Court found two discrete searches: the one supported by a warrant directing the Toledo police to search the Sanchez house for narcotics; the other, a warrantless search, by the federal agent for explosives. In response to the government's argument that such a warrantless intrusion was constitutionally permissible because the federal agent was on the Sanchez property at the request of local police the Court stated:

> On the facts of this case, there were two simultaneous but distinct intrusions, each conducted by separate agencies for the purpose of securing different types of property. Each search had to be authorized independently by a separate warrant unless the warrant was excused by a valid exception. Here the federal agent had probable cause to suspect the presence of explosives in the defendant's house, and he had the opportunity to procure a proper warrant. Instead of doing so, he chose to ignore the warrant requirement and to enter the premises with local officers who were conducting a search for unrelated property. Such action circumvents the safeguards of the federal Constitution.

At first blush, it would appear that *Sanchez* militates against admission of this evidence because of Agent Baxter's involvement. There are differences between the cases, however. In *Sanchez* the court concluded the federal agent had probable cause to believe explosives were in the Sanchez house. The State officer was seeking narcotics. Here both federal and State officers were in hopes of finding the same arson evidence. The narcotic warrant in *Sanchez* was bona fide in every

---

the prosecution. In this case defendant had specifically mentioned the existence of incriminating audio tapes. He had told the investigators he didn't know where the tapes were. As a matter of fact, the tapes were where the officers

suspected. They were found in Belcher's room during the search. Despite this, the parties both argue that no probable cause existed to search for arson evidence so the Court accepts their view.

respect; the gambling warrant here was a pretext. But even if Lt. Sheffield, armed with the gambling search warrant, had a legal right and duty to search the room, federal agent Baxter had no authorization whatsoever to search for arson evidence.

The government attempts to justify Baxter's presence by pointing to his knowledge of gambling and his previous experience investigating gambling. United States' *Supplemental Response to Motion to Suppress Evidence* at p. 12. Moreover, "Baxter had been told by the United States Attorney's Office that consideration would be given to federal gambling charges should the evidence be found to warrant such charges." *Id.* The possibility that *if* gambling evidence were found, a federal charge *might* be made against Belcher hardly supports the contention that Baxter was authorized to search for arson evidence under the provisions of the State gambling warrant executed by Lt. Sheffield.

Defendant cites *United States v. Warren*, 550 F.2d 219, 225 (5th Cir.1977). Drug enforcement administration agents boarded a vessel along with officers of the Coast Guard. Although suspecting the boat was smuggling narcotics, the federal agents did not have probable cause to search for drugs. They attempted to justify both their presence and their search by arguing that the Coast Guard is authorized to make safety inspections at any time. The Fifth Circuit agreed that the Coast Guard was permitted to stop and search a vessel for safety violations without probable cause but went on to hold:

> The Coast Guard boarding party consisted not solely of three Coast Guardsmen but also of agents from the Drug Enforcement Administration and Customs. All evidence derived from the search of the Stormy Seas was a product of these two agents. This evidence was unconstitutionally obtained for two reasons. First, nowhere in 14 U.S.C. § 89(a) is the Coast Guard authorized to delegate its authority to stop and search a vessel to members of other branches of the federal government. Therefore, any evidence derived from the efforts of these two agents was unconstitutionally obtained. The two agents had absolutely no authority to board the Stormy Seas.

Applying *Warren*, we find no authority for Lt. Sheffield to delegate his duty to Agent Baxter. The government attempts to distinguish these cases on the grounds that "Lieutenant Sheffield executed the search warrant, found the items which have been described as arson evidence, seized all of the evidence that was seized and filled out the inventory of the search." United States' *Supplemental Response to Motion to Suppress Evidence* at p. 12. The defendant reminds us, however:

> Baxter, himself testified that he was not merely 'present' as some non-interested by-stander, but fully participated in the search, was in the defendant's room the entire time of the search, assisted in removing the evidence from defendant's room to the police vehicles, and participated in the discovery of evidence therein.

Defendant's *Rebuttal to Supplemental Response to Motion to Suppress Evidence* at p. 8.

The government, however, calls the Court's attention to *United States v. Yant*, 373 F.2d 543, 546 (6th Cir.1967), which articulates the premise that "effective cooperation between law enforcement agencies [State and federal] is by no means unconstitutional." *Yant* involved robbery of a United States postmistress, whose life was placed in jeopardy by defendant's use of a dangerous weapon. Defendants were arrested; their car was searched; found were a .45 automatic and a .20 revolver. After upholding the search as neither too remote in time nor in place to preclude admission of the weapons, the Court held at p. 546:

> We specifically reject the suggestion … that the fact that the warrants were issued by a state court and that the original arrest was by local police officers prohibited the Federal officers concerned with the basic underlying federal crime from lending their cooperation both to

the arrest and to the search when they were on the scene of the lawful arrest, contemporaneously with the search.

The key language here is "basic underlying federal crime." This Court has already found as a fact that as to Lt. Sheffield the search for gambling paraphernalia was clearly pretextual. This being true of Lt. Sheffield, it is even less likely Detective Baxter was interested in a supposed "underlying federal crime" of gambling.

The United States also refers us to *United States v. Crawford*, 657 F.2d 1041 (9th Cir.1981). The appellant Donald Crawford was arrested pursuant to a federal arrest warrant charging him with uttering and possessing counterfeit federal reserve notes in violation of 18 U.S.C. § 472. Shortly after the arrest, State agents executed a State search warrant authorizing a search for counterfeit money and photographic negatives of money or plates of money.[7] During the execution of the search warrant, a federal agent entered the residence, but only after he was requested to do so in order to give expert advice as to whether the $150,000 found in a suitcase were counterfeit. This case focused on an analysis of whether compliance with Rule 41 of the Federal Rules of Criminal Procedure is mandatory when evidence seized under a State warrant is used in a federal prosecution. The United States contends that *Crawford* focused on the issue of the effect of the presence of a federal agent. Not so. *Crawford* held that "[t]he mere fact that evidence obtained by State officers, under a State warrant, based upon violations of State law, is used in a federal prosecution does not invoke the requirements of Rule 41." *Crawford* at 1046.

The situation in the instant case would resemble *Crawford* only if Lt. Sheffield, having properly obtained his search warrant to scour the premises for gambling paraphernalia, was in doubt as to whether or not an adding machine tape was connected with gambling and invited in Agent Baxter, with his long experience in gambling investigations, to examine the tape. Instead, what we have is a State official, Lt. Sheffield, obtaining a pretextual search warrant for gambling paraphernalia. Accompanied by Detective Baxter, whose interest plainly was in the crime of arson, he proceeded to execute the search warrant and seized the sought for evidence of the crime of arson.

Because we have found that the federal agent was interested in and was searching for evidence of arson, we must agree with defendant that *Sanchez* and *Warren* are persuasive, though distinguishable, on this aspect of the search in question. Agent Baxter was on the premises without authority. The Code of Virginia is specific in naming those persons who may execute her search warrants; federal officials are not among them. Since Agent Baxter was on the premises without justification under the gambling warrant, he cannot meet the first requirement of the *Coolidge* test which requires the officer to be present on the premises for some independent, legal purpose.

Defendant further contends that the arson evidence must be suppressed because its seizure violated the second part of the *Coolidge* test, that of inadvertence. In *United States v. Hare*, 589 F.2d 1291 (6th Cir.1979), the Sixth Circuit gave thoughtful and careful consideration to this requirement. In *Hare*, agents of the Federal Alcohol, Tobacco, and Firearms Bureau, along with agents of the Drug Enforcement Administration procured a warrant to search defendant's home for an unknown quantity of firearms, ammunition, a sawed-off shotgun and a machine gun, all allegedly possessed in violation of federal criminal statutes. ATF agents actually conducted the search while the DEA guarded the door to the building. Nineteen guns and a substantial amount of ammunition were seized, and the agents also discovered drugs and drug paraphernalia.

---

7. Although the federal government has primary jurisdiction for prosecuting charges related to counterfeiting, it was also a crime in that State.

The federal statutes do not altogether pre-empt the field, and the States have concurrent jurisdiction to prosecute.

Since the federal agents had no warrant to search for and seize the narcotics, the government relied on the plain view exception to the warrant requirement in arguing that the evidence of drug violations was lawfully seized and admissible. The defendant contended that the plain view exception applies only if the discovery is inadvertent, *i.e.,* unexpected and unplanned. *Coolidge v. New Hampshire,* 403 U.S. 443, 469, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971). The district court held that the agents expected to find drugs, that this expectation provided partial impetus for the search, and that the warrant was executed with the intention of seizing any drugs found in plain view. Thus, held the District Court, the warrant was used at least in part as a pretext or subterfuge to search for evidence of drug violations, thus rendering the evidence inadmissible.

In reversing the district court, the Sixth Circuit disagreed with the trial court's findings and stated that there was no indication that the federal agents were using the plain view doctrine as a ploy to evade the warrant requirement. The Court further noted in analyzing the *Coolidge* inadvertency requirement:

[W]e conclude, then, that 'inadvertence' in this context means that the police must be without probable cause to believe evidence would be discovered until they actually observe it in the course of an otherwise justified search. There are many times when a police officer may 'expect' to find evidence in a particular place, and that expectation may range from a weak hunch to a strong suspicion. However, the Fourth Amendment prohibits either a warrant to issue or a search based on such an expectation. Yet if in the course of an intrusion wholly authorized by another legitimate purpose, that hunch or suspicion is confirmed by an actual observation, the police are in precisely the same position as if they were taken wholly by surprise by the discovery. The same exigent circumstances

exist, and no warrant could have been obtained before the discovery.

*Hare,* at 1294.

The United States reads this language to mean that *whenever* police are empowered by a warrant to be on the premises to search for specified items, they may seize evidence of any other crime, provided their prior expectation of finding such other evidence had never mounted to the level of probable cause. But defendant argues, and we agree, that *Hare* offers no justification for the pretextual search in the case at bar. As defendant argues, "The entire rationale and facts of *Hare* was based upon a distinctive fact situation that found that the initial search or intrusion was for a legitimate other purpose. But where the *initial* intrusion is a pretext, for a search for other property or another crime, *Hare* is distinguishable." Defendant's *Supplemental Memorandum on Law in Support of Motion to Suppress Evidence,* at p. 6.

Indeed, in its holding, the Sixth Circuit emphasized the distinction between the facts before it and those presently before this Court:

This was clearly a serious, valid investigation on the part of the ATF of suspected gun-running; there is absolutely no evidence that the warrant and search for weapons was a pretense fabricated to mask the DEA's lack of probable cause [to search for narcotics].

*Hare,* at p. 1296.

Here the warrant and search for gambling paraphernalia was indeed a pretense fabricated to mask the search for arson evidence.

Supportive also of this distinction drawn in *Hare* between legitimate and pretextual searches is *United States v. Heldt,* 668 F.2d 1238, 1267–68 (D.C.Cir.1981). Defendants argued that searches of Church of Scientology property for various documents were overbroad. Although the issue was whether an otherwise valid search had been transformed into a general one, the Court offered this comment on the inadvertence requirement of *Coolidge:*

[W]e believe the inadvertence limitation stands for the simple proposition that agents must not be searching for items outside the particulars of the warrant when they conduct the search; in other words, agents must act in good faith to confine themselves to searching for the specified items. If, while conducting a search reasonably designed to find the specified item for which probable cause to seize exists on its face, he may seize it. He may not, however, seek a warrant or conduct his search for the purpose of looking for items not included in the warrant; rather, if he finds and seizes such items, he must do so truly 'inadvertently.'

The lesson of *Heldt* is clear: a search warrant for evidence of crime A may not properly be used as a pretext to seize evidence of crime B by officers whose real intent was to find evidence of crime B in the first place.

The case relied upon most heavily by the government to dispute this proposition is *Blair v. United States*, 665 F.2d 500 (4th Cir.1981). Here State of Maryland police, along with local police officers, acting under their statutory powers as customs officers and State marine police, stopped and boarded the CENTAURUS on suspicion that the vessel was smuggling marijuana. The defendants did not protest that the officers had no reasonable suspicion sufficient to support the stop; the officers had such reasonable suspicion. However, defendants argued that an investigatory stop does not include a boarding and that by commencing to board the CENTAURUS without probable cause to support a search the police exceeded the limits of the stop. The Court stated that boarding is a necessary element of many vessel investigatory stops, given the sound and motion of water, the often significant size differential between the government's boat and the investigated vessel, and the extreme mobility of watercraft. Such boarding, however, is part of a brief investigation, and the investigating officers' action must be limited accordingly. While in the process of boarding, however, one of the officers smelled the odor of marijuana, a smell that supplied probable cause for the officers and customs officials to act upon their statutory authority and conduct a search of the boat. During the search they discovered bales of marijuana.

Defendants raised an additional challenge both to the seizure and to the search: they argued that at the outset the officers intended to conduct far more than a brief investigatory stop. The stop and search, they contended, were tainted by such illegality as to mandate exclusion of the evidence. The Fourth Circuit held at p. 506:

> We are not persuaded by the argument. However ill-intentioned the officers, we must restrict our review to the objective circumstances of the detention in determining its lawlessness. Just as courts should not validate an objectively unreasonable search or seizure on the basis of an officer's good faith intentions, *see Terry v. Ohio*, 392 U.S. 1, 22 [88 S.Ct. 1868, 1880, 20 L.Ed.2d 889] ... (1968), so should they steer clear of evidence discovered by objectively lawful means, even if the officers harbored bad faith intent.

Close attention both to the Court's language and the facts in *Blair* show it is not apposite to the situation before this Court. The government sees the warrant to search for gambling paraphernalia, objectively duly supported by probable cause, objectively duly issued, as being the "objectively lawful means" by which Lt. Sheffield and Agent Baxter were in defendant's apartment, analogous therefore to the officers' presence aboard the CENTAURUS. The analogy breaks down, however, because although the Maryland police may indeed have *intended* a further search at the moment of boarding, the *boarding itself was lawful*.

Such cannot be said of the investigators' presence in Mr. Belcher's apartment. The very warrant which admitted them was tainted. The magistrate who issued it had been deliberately misled to believe there was a bona fide purpose to search for

gambling paraphernalia. He issued the warrant on the basis of a deception as to the officer's intent, plan, and purpose. For *Blair* to control, we must hold that it is lawful for an officer, without probable cause to search, to obtain through subterfuge a search warrant for a totally unrelated crime and deliberately use it as a tool to search for the evidence he could not otherwise lawfully or constitutionally procure.

The government's construction of *Blair* flies squarely in the face of *Coolidge* and *Hare*. The *Hare* court held that where the police have probable cause to search for evidence of a crime, their discovery of evidence of that crime while looking for evidence of yet another, different crime cannot be inadvertent. But the court was using that degree of certainty needed to support probable cause as a means whereby to infer an *advertent*, intentional discovery of evidence of a crime other than the one legitimately being investigated. Here, we do not need to resort to such inference to find intent. Under the evidence adduced it is clear that Lt. Sheffield and Agent Baxter were deliberately looking for arson evidence and intended to find it if possible; thus, even without probable cause, their discovery of such evidence was not, as a factual matter, inadvertent. It not being factually inadvertent, I cannot accept the government's argument that it was legally inadvertent.

In addition, in *Blair*, while boarding the CENTAURUS, the officers "smelled the odor of marijuana" which the court found "supplied probable cause" to search the boat. *Blair* at 506. Once on board the vessel, there was unmistakable evidence of larger scale activity in smuggling marijuana than even the police officers had suspected. The bales discovered, the Court held, fell within the plain view exception of the warrantless search. In the present case we have a completely different set of facts. Here the police officers had already arrested defendant as an arsonist; unwilling or unable to obtain an arson search warrant, they contrived the gambling search warrant. Once in defendant's room, there was no additional event, as in *Blair*,

that provided probable cause to *then* form the belief that arson evidence was nearby. There was only the very evidence whose seizure had all along been the goal of this manipulation of the warrant-issuing process. The *Blair* court stated plainly at p. 506:

> Whatever the officers may have intended to do had probable cause to search not arisen, it is clear that objective circumstances made the seizure and search entirely lawful.

The government would have it that *any* investigator searching for evidence of gambling would have seized the same evidence as did Lt. Sheffield and Agent Baxter; that there arose on the scene of the search probable cause to seize evidence of an arson. This simply is not a fact. Blank cassette tapes do not signal arson in the way the odor of marijuana implies its presence. The government responds by pointing to the language of the warrant listing "tapes" and to their belief that defendant conducted his bookmaking activities by telephone, recording the conversations. I am not persuaded. The Court's own experience in trying gambling cases leads me to believe the "tapes" mentioned in the warrant and emphasized by the government, referred to adding machine tapes, not audio tapes. In any event, I have found that the officers were not there to search for gambling evidence. Their purpose was to find and seize arson evidence. They used the gambling gambit as a subterfuge to secure entry. Nothing happened *after* entry, as in *Blair*, to validate the arson search.

### III

Defendant argues finally that the government so far exceeded the limits of a proper search that it converted a limited search ostensibly for gambling devices into a general, exploratory search, prohibited by the Fourth Amendment. The argument is supported by *United States v. Rettig*, 589 F.2d 418 (9th Cir.1978).

In *Rettig*, drug enforcement agents requested that a federal magistrate in Los

Angeles issue an arrest warrant for Rettig on cocaine importation charges and also requested a search warrant for his Morro Bay residence. The magistrate issued the arrest warrant, but declined to issue the search warrant, finding that the information adduced by the agents was stale.

The agents executed the arrest warrant and took Rettig into custody. Then the agent went to a State court judge, again to attempt to obtain a search warrant for the house. On the basis of the affidavit the State court judge issued a search warrant. The affidavit contained no information to justify the State judge's concluding that the search would be for anything other than marijuana, paraphernalia for the use of marijuana, and identification of Rettig as the owner or occupant of the house. Immediately after the search warrant was issued, an agent returned with it to the Morro Bay house where, with five or six others, he conducted an extensive search. Seized were some 2,288 items, pertaining to evidence of the cocaine charge, not to the charge of possession of marijuana.

The court noted that in sharp contrast to the affidavit filed with the State judge in support of a search warrant for marijuana, the affidavit filed the day before with the federal magistrate had described in detail an elaborate scheme to smuggle cocaine from Peru. The search that was conducted, and the items seized, were more pertinent to cocaine importation than to the marijuana charge. The court concluded that the search was for purposes and objects not disclosed to the magistrate and that the search warrant was merely an "instrument for conducting the search for which permission had been denied on the previous day, a search that pertained to evidence of the cocaine charge, not to the possession of marijuana." *Rettig*, at 421. Concerned about the pretextual nature of the search, the Court spoke specifically to the purposes of the warrant requirement:

Had the state judge who issued the search warrant been informed of the true reason for the warrant request and of the scope of the search contemplated, he

might have concluded that it was permissible to issue the warrant for the purpose of searching for evidence of the conspiracy here in question, *subject to explicit limitations* on the scope of discovery and seizure in order to prevent an overly intrusive search. But the agents withheld this information. A judicial officer cannot perform the function of issuing a warrant particularly describing the places to be searched and the things to be seized, and of supervising the proper return of such process, where the police fail to disclose an intent to conduct a search the purposes and dimensions of which are beyond that set forth in the affidavits.

It is, of course, not the rule that only evidence uncovered during the search warrant invariably be described in the warrant before it may be seized.... Where evidence is uncovered during the search pursuant to a warrant the threshold question must be whether the search was confined to the warrant's terms. As the Fifth Circuit stated '[t]he search must be one directed in good faith toward the object specified in the warrant or for other means and instrumentalities by which the crime charged had been committed. It must not be a general exploratory search....' *Gurleski v. United States*, 405 F.2d 253, 258 (5th Cir.1968), *cert. denied*, 395 U.S. 977, 981 [89 S.Ct. 2127, 2140, 23 L.Ed.2d 765, 769] ... (1969) cited with approval in *United States v. Honore*, 450 F.2d [31] at 33 [9th Cir.1971]. We find the record establishes that the agents did not confine their search in good faith to the objects of the warrants, and that while purporting to execute it they substantially exceeded any reasonable interpretation of its provisions. As interpreted and executed by the agents this warrant became an instrument for conducting a general search. Under the circumstances it is not possible for the court to identify after the fact the discrete items of evidence which would have been discovered had the agents kept their search within the bounds permitted by the warrant; and

therefore all evidence seized during the search must be suppressed.

Like the warrant in *Rettig*, the one issued for defendant Belcher's apartment described with particularity the items to be seized. But because the officers intended from the outset to depart from its terms and to look primarily for arson evidence while also seizing gambling evidence, there was the same complete excavation of defendant's room, the same kind of seizure of any and all items so as to cover both crimes to and beyond the warrant's limits.

It is crucial to recall in this context that officers Sheffield and Baxter deliberately sidestepped the requirement that a neutral and detached magistrate have an opportunity to draft, *with particularity*, a warrant authorizing seizure of *arson* evidence. The peril of such a course is well stated by the D.C. Circuit in *United States v. Heldt*, 668 F.2d 1238, 1257 (D.C.Cir.1981):

> When investigators fail to limit themselves to the particulars in the warrant, both the particularity requirement and the probable cause requirement are drained of all significance as restraining mechanisms and the warrant limitation becomes a practical nullity. Obedience to the particularity requirement both in drafting and executing a search warrant is therefore essential to protect against the centuries-old fear of general searches and seizures.

Where, as here, the officers not only went beyond the scope of the warrant as issued but also had purposefully avoided presenting their case for a search of arson evidence to a magistrate, they are doubly culpable.

In *United States v. Tamura*, 694 F.2d 591, 596 (9th Cir.1982), the court considered an FBI seizure of accounting records other than those specified in the warrant and stated:

> The essential safeguard required is that wholesale removal must be monitored by the judgment of a neutral detached magistrate. In the absence of an exercise of such judgment prior to the seizure ..., it appears to us that the seizure, even

though convenient under the circumstances, was unreasonable.

And indeed the appellate court upheld defendant's conviction only because the only records admitted against him were those specified in the warrant.

The United States, in reply, simply cites *United States v. Golay*, 502 F.2d 182 (8th Cir.1974) and *United States v. Crouch*, 648 F.2d 932 (4th Cir.1981) for explication of the boundaries of searches pursuant to warrants. *Golay* involved a warrant to search for stolen diamonds. In the course of this search, the officers found and seized a briefcase containing $9,000 in bundles marked with the stamp of First National Bank of St. Louis, and a pistol, all of which linked defendant to the extortion scheme for which he was convicted.

Even countenancing the government's argument that the search of defendant Belcher's apartment did not exceed the *letter* of the gambling warrant, the distinction between *Golay* and this case is plain. Lt. Sheffield and Agent Baxter *were not* interested in evidence of gambling in the way the police in *Golay* were interested in locating stolen diamonds. The *Golay* officer's discovery of the ransom money in a place where stolen gems might be secreted is thus legitimated, in a way that the conduct of the officers here—intent on arson evidence—cannot be.

Neither is *Crouch* helpful, concerned, as is *Golay*, with the permissible activity an officer may undertake pursuant to a bona fide valid warrant. Given a search warrant directing seizure of chemicals used illegally to manufacture methamphetamines, the police were well within the strictures of the warrant when they looked in envelopes, where drugs may be secreted, and seized incriminating letters there found in plain view. For the government to argue that *Crouch* justifies the sweeping seizure of defendant's belongings is, at best, misguided. *Crouch*, like *Crawford*, simply says of a discrete activity: It was not outside the scope of the warrant; the places searched were legitimately suspect hiding places for that which was sought. Neither case even

remotely authorizes the broad search herein carried out.

Even more astonishing is the government's insistence that *Tamura* allows seizure of any and every sort of evidence—so long as only that evidence specified in the warrant is introduced at trial. The *Tamura* court clearly saw the distinction between seizure of even numerous items not specified by the warrant and a situation where "the officers so abused the warrant's authority that the otherwise valid warrant was transformed into a general one, thereby requiring all fruits to be suppressed." *Tamura,* at 597.

The legal situation presented by the facts of this sweeping search is very close to that in *United States v. Richmond,* 57 F.Supp. 903, 906–7 (S.D.W.Va.1944). Defendant was charged with working at an unregistered still, and with making, possessing, and fermenting mash fit for distillation. In granting a motion to set aside the verdict and grant a new trial, the court addressed specifically the search of defendant's home and the seizure of certain items of clothing and floor covering. Although warrantless, the arrest of the defendant was lawful; the officer had reasonable cause to believe Richmond had committed a felony. The officer was lawfully on the premises since he had gone there for the purpose of arresting the defendant and had gained entrance after being invited by the defendant to come into his house. Nor did the court find a reasonable search of the premises under these circumstances unlawful. Once an officer has made a lawful arrest he has the right to proceed to search the immediate premises to discover and seize any contraband articles which may have been used by the defendant in connection with the violation of law with which he is charged.

However, the officer in question searched the entire house, seized clothing belonging to the defendant (which was afterwards introduced in evidence to compare with garments found at the still site) and took pieces of linoleum from the pantry to compare with coverings on mash barrels at the still.

In a very persuasive analysis of Fourth Amendment jurisprudence the court observed:

Lastly, defendant contends that his arrest by Groves and the search of his premises were illegal, and that therefore evidence procured by means of the search should have been excluded from consideration by the jury.

These contentions raise questions which are vital in their bearing upon the constitutional right of citizens to be protected against unreasonable searches and seizures, and their equally important right of immunity from illegal arrests. To the shallow and undiscerning mind it may appear absurd and illegal that evidence pointing clearly to the guilt of a defendant should be ignored and excluded from consideration, merely because it may have been obtained by illegal or unconstitutional means. Why should a criminal be protected by the law, and sometimes permitted to escape punishment, because of a tender regard for his right of immunity from unlawful searches and seizures? The answer which the wise man makes to such a question, which is also the answer of the law, is that only thus may the salutary provisions of the Constitution, made to 'secure the blessings of liberty to ourselves and our posterity,' be maintained and kept alive. The constitutional guarantees were not established for the benefit of criminals, but to protect the innocent. Nevertheless, if they are permitted to be infringed in order to obtain evidence against the guilty, how shall we have assurance that the innocent will not likewise suffer; since it is only after the search and seizure are made that their results can be known? Our forefathers were only too familiar with the notorious 'writs of assistance' and other intolerable abuses which had grown up and which might be expected to continue to grow and flourish in the absence of such guarantees as were inserted in the Constitution for the protection of the privacy of the home.

Courts must be vigilant to detect and to check any and all invasions of the constitutional right of immunity from unreasonable searches and seizures, without regard to the indicated guilt or innocence of the person whose premises are the object of the search; otherwise the right itself may be insidiously undermined and destroyed.

The defendant particularly invited the Court's attention to *Richmond,* and while its dependence upon exclusion is, in my judgment misplaced, its statement of the importance of the issue is apt. The Constitution does not permit a wholesale search of a citizen's home on the basis of the government's notion that whatever evidence is illegally seized will not be admitted at trial anyhow. Such a view indeed reminds us too strongly of the "writs of assistance," because it is the unreasonable search that is itself offensive to our ideas of freedom and privacy, not the uses that are made of its fruits.

### IV

Exclusion as a tool to prevent unreasonable searches is, in my view, itself unreasonable. There are or may be devised far better procedures which will serve to protect the innocent while permitting the conviction of the guilty.[8] But the exclusionary rule is a part of the law of the land and I must apply it. The motion to suppress is GRANTED.

And it is so ORDERED.

---

8. An important and worthy exploration of this problem is set forth in Wilkey: *Enforcing the Fourth Amendment by Alternatives to the Exclu-* *sionary Rule* (National Legal Center for the Public Interest, Washington, D.C., 20036, 1982), reprinted at 95 F.R.D. 211.