UNITED STATES of America,
Plaintiff–Appellee,

v.

Randy Lee EWAIN, Defendant–Appellant.

No. 95–50133.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 15, 1995.

Decided March 12, 1996.

467

Steven F. Hubachek, Cohen & Hubachek, San Diego, California, for defendant-appellant.

Steve Miller, Assistant United States Attorney, San Diego, California, for plaintiff-appellee.

Before: HUG, Chief Judge, BEEZER and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This appeal raises issues involving search and seizure, and construction of a provision in the mail theft statute.

## I. FACTS

Ewain, a former postal employee, came under suspicion by a postal inspector for mail theft and by a state narcotics detective for selling methamphetamine. Both lines of suspicion arose as a consequence of a fistfight Ewain had with his roommate. The roommate moved out and told a postal inspector Ewain was making counterfeit mailbox keys and trading them for methamphetamine. The postal inspector told a state narcotics

detective, who successfully arranged a controlled buy of methamphetamine at Ewain's house.

The state narcotics detective obtained a search warrant for drugs, drug paraphernalia, and documents relating to narcotics dealing, and invited the postal inspector along on the search. The postal inspector had not obtained a search warrant because he felt that the roommate's story was insufficient probable cause. Both suspected Ewain was counterfeiting keys, based on the roommate's story, and the narcotics detective wanted the benefit of the postal inspector's more educated eye.

The search turned up a number of plastic baggies, at least two of which appeared to contain methamphetamine. In addition, a cornucopia of postal theft evidence was found: other people's mail hidden under the mattress; credit cards that had been mailed to other people but never received; hand written notes containing biographical information about the people whose credit cards were found; checks made out to people who did not live in the house; a metal box containing a disassembled postal lock and rubber mold of an "arrow key;" a partly carved counterfeit arrow key still attached to the bare metal from which it was being made; a toolbox containing a postal arrow lock; a counterfeit arrow key; an apartment house key keeper; and a clay mold with the impression of postal arrow keys hidden under the mattress.

An "arrow key" is used by mail carriers to access a bank of mailboxes or a collection box that is locked by an "arrow lock." They are called "arrow" keys and locks because of the arrow conspicuously stamped on them. They are manufactured by the Postal Service in Washington D.C. and are distributed through controlled channels. Arrow keys are "accountable property." That means a mail carrier must check out an arrow key at the beginning of each delivery day and return it at the end. A "key keeper" is a kind of key safe often used in apartment houses. A postal employee has a key to the key keeper. The key keeper contains a key or a button unlocking the mailboxes in the apartment house.

Several months after the search of Ewain's house, Ewain's wife was arrested wearing a postal worker's uniform and rummaging through an apartment house mailbox. She called Ewain on the tapped jail phone. He was not home, so she talked to another person there. Asked what she'd been arrested for, Mrs. Ewain said:

He'll know.

. . .

You know, mail theft. I was in my uniform, the whole shebang.

. . .

Tell him to make sure he's got his place totally clean.... I wanted to let him know that I did put down his address as my address.

Mrs. Ewain actually lived at a different address. Based on her false statement when she was arrested that she lived at Mr. Ewain's address, another search warrant was obtained, and this turned up more postal theft evidence: more mail addressed to other people, personal information on credit card applicants, a broken arrow key in Ewain's dresser, and more arrow keys.

## II. ANALYSIS

### A. The Search.

■ Ewain challenges the denial of his motion to suppress the postal theft evidence from the first search of his house. He argues that the search warrant was for evidence of narcotics dealing, not postal theft; that bringing the postal inspector along was a means of expanding the search beyond its lawful purpose; and that the postal theft evidence was not in plain view because an untrained observer, unlike a locksmith or postal inspector, could not recognize arrow keys and the like and understand their significance. The lawfulness of a search and seizure is a mixed question of law and fact reviewed *de novo*. *United States v. Huffhines*, 967 F.2d 314, 316 (9th Cir.1992).

■ The Fourth Amendment requires warrants to particularly describe the place to be searched and items to be seized. "[T]he scope of a lawful search is 'defined by the object of the search'...." *Maryland v. Gar-*

*rison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987). It is undisputed that the postal theft evidence was outside the warrant's description of items to be seized.

It is also undisputed that the police had a lawful warrant and conducted a lawful search for narcotics evidence, and that the places where postal theft evidence was discovered were places which could properly be searched for narcotics evidence. Thus it is undisputed that the narcotics detective had a lawful right to be where he was when the postal theft evidence was discovered. It is also undisputed that a person with the knowledge of a postal inspector or locksmith would immediately recognize the arrow keys and other items as evidence of postal theft.

■ Ewain argues that the narcotics search warrant was being used as a pretext to search for postal theft evidence. We cannot accept the factual proposition that the search warrant was a pretext to search for something other than what it described. The district judge made a fact finding that the police really were looking for narcotics evidence:

> In this particular case, I think it's absolutely clear that there was a serious, valid investigation for evidence of narcotics. They got a controlled buy. That's—that's what they got, and they were, therefore, going to go and search the residence for evidence therefor, and I find that there's absolutely no evidence of pretext. Certainly if they were able to find evidence of postal violations, they wanted to make certain that they did in fact seize that and not overlook it due to their lack of expertise.

> And thus I find that there was good faith and I deny the motion to suppress.

There is no reason to doubt the correctness of this finding. Though we agree with the district court that the officers had a subjective good faith intent of finding narcotics, this finding is not determinative, as we explain below.

There is no reason to doubt that the postal inspector was brought along for his expertise in spotting mail theft evidence. The narcotics detective testified that postal theft and methamphetamine dealing often go hand in hand. The district judge noted that "it's an amazing thing. I don't think I've ever seen a mail—theft of mail case that didn't involve methamphetamine users." We need not decide whether the postal inspector was mistaken in thinking he lacked probable cause. Both the postal inspector and the narcotics detective suspected they would find mail theft evidence. But they did not just go looking for mail theft evidence on a pretext of looking for narcotics evidence. They were interested in finding narcotics evidence, had a good warrant to search for it, looked where narcotics evidence might be expected to be found, and found mail theft evidence in plain view, at least to a trained observer. The evidentiary significance of the subjective good faith of the officers is that it tends to show they really did confine their search to places which would be searched for methamphetamine evidence, and did not expand it to places where they would expect to find postal theft but not methamphetamine evidence.

■ Once the police are lawfully searching in a place for one thing, they may seize another that is in plain view, if its incriminating nature is immediately apparent. *Horton v. California,* 496 U.S. 128, 136, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990). After the plurality opinion in *Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971), it had been thought that the discovery of the thing not described in the warrant had to be "inadvertent," but *Horton* holds that inadvertence is not required. If a police officer has a valid warrant for one item, and "fully expects" to find another, based on a "suspicion ... whether or not it amounts to probable cause," the suspicion or expectation does not defeat the lawfulness of the seizure. *Horton,* 496 U.S. at 138–39, 110 S.Ct. at 2308–09.

■ The Constitution limits lawful search warrants to those "particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. General warrants are unconstitutional. The plain view doctrine, applied in the context of a search pursuant to a warrant, does not allow the use of a properly limited search warrant as a pretext to search for anything else. *United States v. Rettig,* 589 F.2d 418

(9th Cir.1978). In *Rettig,* a magistrate judge had denied an application for a search warrant for evidence of a large cocaine conspiracy, because the information was stale. The police set up a ruse to arrest the defendant at his home, caught him flushing marijuana down the toilet, obtained a state search warrant for marijuana evidence, and then spent hours going through documents, as would be expected in an investigation of a cocaine conspiracy but not in a simple marijuana possession search. They found 2,288 items, mostly written material. We held that the evidence should be suppressed, because "the agents did not confine their search in good faith to the objects of the warrant," and "substantially exceeded any reasonable interpretation of its provisions." *Id.* at 423. *See also United States v. Sanchez,* 509 F.2d 886, 888 (6th Cir.1975); *but see United States v. Hare,* 589 F.2d 1291, 1296–97 (6th Cir.1979).

■ This is not to say that anytime the search turns up evidence outside the scope of the warrant, the additional evidence must be suppressed. Where the search pursuant to the warrant is a part of a " 'serious valid, investigation' and not 'a pretense fabricated to mask the [federal officers'] lack of probable cause' to search for evidence" of crimes other than that specified in the warrant, the plain view evidence is admissible. *United States v. Washington,* 797 F.2d 1461, 1471 (9th Cir.1986).

■ Some of the comments on subjective state of mind in *Rettig, Washington,* and *Sanchez* may be obsolete because of the Supreme Court's subsequent decision in *Horton.* It remains the law, however, that "[i]f the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton,* 496 U.S. at 140, 110 S.Ct. at 2310. The Constitution does not permit use of a properly limited warrant as a pretext for a general search, or for a search outside the scope of the warrant.

In this case, unlike *Rettig,* the officers looked in places where they could reasonably be expected to look for and find methamphetamine evidence. Because the officers looked only where they could properly look under the terms of a particularized and proper search warrant, the householder's privacy was no more impaired than it would have been had they expected to find only the things specified in the warrant. As *Horton* notes, the seizure of items in plain view, in these circumstances, does not invade the privacy of the person searched beyond what the warrant authorizes, only his possessory interest. *Id.* at 134, 110 S.Ct. at 2306–07.

The one factor not entirely resolved by our precedents is whether it matters that the narcotics detective brought the postal inspector along. In *Washington,* we cited Professor LaFave's remark that a "defendant is most likely to convince a court that bad faith was present if he can show that officers with enforcement interests and responsibilities unrelated to the crime for which the search warrant was issued participated in the search." *Washington,* 797 F.2d at 1470 (citing 2 W. LaFave, *Search and Seizure* § 4.11(e)). It is undisputed that the state narcotics detective brought the federal postal inspector along for his expertise in spotting evidence of postal theft.

It is difficult to be sure just what "good faith" means, and what significance it has, with respect to bringing an officer with expertise in another area of law enforcement along, after *Horton* and in light of *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). "In view of the deterrent purposes of the exclusionary rule, consideration of official motives may play some part in determining whether application of the exclusionary rule is appropriate *after* a statutory or constitutional violation has been established. But the existence *vel non* of such a violation turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Id.* at 135–36, 98 S.Ct. at 1722–23. LaFave now says that the cases focusing on subjective good faith are of doubtful authority. 2 W. LaFave, *Search and Seizure* § 4.11(e), at 358 & 1995 Supplement, at 127. *Horton* teaches that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective

state of mind of the officer." *Horton,* 496 U.S. at 138, 110 S.Ct. at 2308–09.

■ *Rettig* and *Washington* can and should be reconciled with *Horton.* The officers' subjective good faith is not the determinant of whether the evidence in plain view should be suppressed. Using a subjective criterion would be inconsistent with *Horton,* and would make suppression depend too much on how the police tell their story, rather than on what they did. *See United States v. Bowhay,* 992 F.2d 229, 231 (9th Cir.1993)("Penalizing officers who are candid enough to admit that they hope to find evidence of a crime can only encourage obfuscation and dishonesty, without protecting reasonable expectations of privacy."). *Rettig* and *Washington* require that searches be confined by the required particularity in the warrants, and that has not changed. A policeman's pure heart does not entitle him to exceed the scope of a search warrant, nor does his ulterior motive bar a search within the scope of the warrant, where the warrant was properly issued. Ulterior motive may be evidence justifying an inference that the search exceeded the scope of the warrant, as in *Rettig,* but it is not the determining factor, where the warrant itself was properly issued. The determination to be made is whether the police confined their search to what was permitted by the search warrant. "It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton,* 496 U.S. at 136, 110 S.Ct. at 2308.

■ Subjective motivations, and such factors as inviting someone along, may be evidence that the search exceeded the scope of the warrant. Inviting another officer along, however, is not *ipso facto* improper. *See United States v. Bonds,* 12 F.3d 540, 571 (6th Cir.1993) (a federal agent may tag along on a state search without tainting evidence of federal crimes uncovered in the process, if he has no probable cause to search which would allow him to obtain a legitimate warrant.); *United States v. Johnson,* 707 F.2d 317, 321 (8th Cir.1983). The scope of the search could exceed what the warrant permits without the

invited officer, and could be properly confined even though he is there. His presence is at most evidence bearing on the probability that the officers looked in places they would not have looked had they been searching only for the things specified in the warrant. If the officers looked only where they were entitled to look under the terms of the warrant, and where they would have looked for the things described in the warrant, then the privacy of the person whose belongings are searched in those places has already been lost, *see Horton,* 496 U.S. at 133, 110 S.Ct. at 2305–06, and another pair of eyes does not add to that loss. Now that *Horton* has eliminated the "inadvertent" discovery limitation in the plurality opinion in *Coolidge,* it no longer matters that the invited-along officer was looking for what he found, which thing was not described in the warrant. What matters is whether the officers looked in places or in ways not permitted by the warrant. That the officer invited along, and not the officer to whom the warrant was issued, has expertise which makes it "immediately apparent" to him that objects in plain view are evidence of a crime, does not establish that the search went beyond the scope of the warrant. *See United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (whether it is immediately apparent that an object is evidence should be evaluated by what would be immediately apparent to a trained officer, not necessarily to an untrained person); *United States v. Wright,* 667 F.2d 793, 795–97 (9th Cir.1982) (fact that ATF agent looking for evidence of firearms crimes invited state narcotics detective along, knowing narcotics evidence might also be present, did not require suppression, but fact that the officers exceeded the scope of the warrant did).

In this case, we agree with the district judge's finding that the search was in good faith, in the objective sense that it did not go outside the scope authorized by the search warrant. Seeing the postal evidence did not require the officers to look anywhere they would not have looked for methamphetamine evidence. The criminality was, without question, immediately apparent to the postal in-

spector. The district judge properly denied the motion to suppress.

Ewain argues that the second warrant, executed on March 18, 1994, was the tainted fruit of the prior illegal search, but that contention fails because of our affirmance of the district court's decision on the first search.

### B. *Jury Instructions.*

Ewain argues that the district court erred by failing to instruct the jury that conviction under 18 U.S.C. § 1704 requires that the illegally procured keys or locks be "in use" by the Postal Service. Count two of the indictment charged Ewain with illegal possession of a postal mail lock, and count five, with illegal possession of a postal key, both in violation of 18 U.S.C. § 1704. He argues that an essential element of both of the crimes is that the item was "in use" by the post office, but the court failed so to instruct the jury.

■■■ We review *de novo* whether jury instructions correctly state the elements of an offense. *United States v. Mundi,* 892 F.2d 817, 818 (9th Cir.1989). A trial judge is given substantial latitude in formulating jury instructions as long as they adequately cover all of the issues, and we review challenges to this formulation for abuse of discretion. *United States v. Abushi,* 682 F.2d 1289, 1299 (9th Cir.1982).

The statute under which Ewain was charged criminalizes wrongful taking of keys suited to a lock "in use" on the mails and keys to other postal receptacles, and possessing or making "such" keys, and possessing "such" locks:

> Whoever steals, purloins, embezzles, or obtains by false pretense any key suited to any lock adopted by the Post Office Department or the Postal Service *and in use* on any of the mails or bags thereof, *or* any key to any lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter; or

> Whoever knowingly and unlawfully makes, forges, or counterfeits *any such key,* or possesses *any such mail lock or key* with the intent unlawfully or improperly to use, sell, or otherwise dispose of the same . . .;

> . . .

> Shall be fined not more than $500 or imprisoned not more than ten years.

18 U.S.C. § 1704 (emphasis added).

■■ The court instructed the jury that for the lock charge in count II, the government had to prove that the defendant possessed a lock adopted by the Postal Service with the intent unlawfully to use it. For the key charge in count V, the court instructed that the government had to prove that the defendant knowingly possessed a key suited to a lock adopted by the Postal Service with the intent unlawfully to use it or cause it to be used. Ewain argues that, for each of the charges, the court should have added an element requiring that the relevant lock be "in use" by the Postal Service. Because it did not, he argues, he is entitled to reversal under *United States v. Gaudin,* 28 F.3d 943, 945 (9th Cir.1994). He also raises an issue of variance between the indictment and the proof, but that was not raised in the opening brief, so we decline to consider it. *Williams v. United States General Services Admin.,* 905 F.2d 308, 312 (9th Cir.1990).

■■ The word "such" in the phrases "any such key" and "any such mail lock or key" in the second paragraph of the statute means that in order for the making or possession of a key or lock to violate the second paragraph, the key or lock has to be of the kind described in the first paragraph. The question posed by Ewain's argument is whether the words "in use" in the first paragraph modify only locks in the first clause, or travel past the "or" all the way to the end of the paragraph. "We must examine the meaning of the words to see whether one construction makes more sense than the other as a means of attributing a rational purpose to Congress." *Longview Fibre Co. v. Rasmussen,* 980 F.2d 1307, 1311 (9th Cir.1992).

■■ The purpose of the statute is to punish theft and fabrication of keys and locks that protect the mail. The elements of the crime charged in count II were that Ewain (1) knowingly and unlawfully, (2) possessed a mail lock, (3) to a lock box, lock drawer, or

other authorized receptacle for the deposit or delivery of mail matter, (4) with the intent unlawfully or improperly to use it or cause it to be used. The phrase "in use on any of the mails or bags" did not need to be a part of the instruction, because Ewain was not charged with possession of that kind of lock. The phrase "such mail lock" refers to postal locks in use on mail bags. It also refers to locks on mail receptacles, such as mailboxes or key keepers. If a postal worker takes home an in use mailbag lock, which he is not supposed to take home, and satisfies the other elements, that would be the crime for which the government would have to prove "in use" as an element.

Likewise, Ewain was charged in count V with possessing "a key suited to locks adopted by the Postal Service and in use on any of the mails and bags thereof, and to any lock box, lock drawer and other authorized receptacle" with the intent to use it or cause it to be used. This indictment charged multiple offenses, one of which would have required an "in use" instruction, but the proof related to offenses not requiring an "in use" instruction. Though inartful, and perhaps subject to narrowing by a bill of particulars had one been sought, the government could charge in the conjunctive and prove in the disjunctive. *United States v. DeFilippis,* 637 F.2d 1370, 1374 n. 7 (9th Cir.1981).

If the proof related to a key for a lock on the "mails or bags thereof," the government would have had to prove that the lock to which the key was suited was "in use" on the mails or bags. Because the proof related to a key for "any lock box, lock drawer, or other authorized receptacle for the deposit or delivery of mail matter," the "in use" element had no application. The crimes are distinct.

Ewain's construction would require dismissal of a stolen or forged key case if the government could not prove that the lock it fit was "in use." In a big city, that could require postal inspectors to try the key in thousands or millions of mailboxes, until they found the right one. The distinctive arrow on an "arrow key" will in many cases demonstrate that the key is suitable for a lock adopted by the post office, and obviate this Sisyphean and pointless investigative effort.

The jury necessarily found the required elements under the court's instructions. It had to find that the lock was adopted by the Postal Service, and that the key was suited to a lock adopted by the Postal Service, as well as the mens rea and scienter elements. That was sufficient.

## C. *Other Issues.*

■■■ Ewain argues that the evidence was insufficient to establish conspiracy. That is incorrect because the evidence linked him to others whom he directed or supplied with keys and showed that they possessed keys to mail receptacles and used them to steal mail. He argues that the counterfeit keys he forged were not proved to open an actual post office lock. The evidence established that the keys were suited to post office locks, in the sense of being designed and fabricated to open them, which is sufficient. He also argues that the evidence does not support a finding that he possessed the postal locks, stolen mails, or keys because others lived with him in the house and, without other evidence, the fact that contraband is found at a residence does not establish possession. *United States v. Reese,* 775 F.2d 1066, 1073 (9th Cir.1985). In this case, there was abundant other evidence linking Ewain to the contraband.

■■■ Ewain also argues that at sentencing, the court erred by holding him responsible for the losses caused by his coconspirators' use of credit cards stolen from people's mailboxes. The stolen credit cards found at Ewain's home, notes, and other evidence indicating that he conspired with and directed the people who used them sufficed to establish his responsibility, on review for clear error. *United States v. Conkins,* 9 F.3d 1377, 1384 (9th Cir.1993). The judge found that the presentence report correctly related the coconspirators' acts to Ewain, and probably understated the financial losses inflicted on the victims. That was sufficient. *See United States v. Rigby,* 896 F.2d 392, 394 (9th Cir.1990). Ewain argues that his sentencing enhancement for being an organizer or leader was error, but there was sufficient evidence that he "exercised some control

over others ... or he must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Hoac,* 990 F.2d 1099, 1110 (9th Cir.1993).

 Ewain argues that he should have been permitted to present testimony by the alleged coconspirators that their thefts were outside the scope of his conspiracy and that he was not an organizer. But the district judge permissibly exercised his discretion, in light of the extensive testimony about the crimes he had already heard at the jury trial, the convictions of the coconspirators, and Ewain's opportunity otherwise to rebut the presentence report in two memoranda and orally at the hearing, to limit the evidence to be heard at the sentencing hearing. *See United States v. Sarno,* 73 F.3d 1470 (9th Cir.1995) (citing *United States v. Baker,* 894 F.2d 1083, 1084–85 (9th Cir.1990)).

AFFIRMED.