NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JESUS STEVE ROMERO GOMEZ[1], *Appellant.*

No. 1 CA-CR 20-0001
FILED 1-14-2021

Appeal from the Superior Court in Maricopa County
No. CR2016-002123-002
The Honorable Timothy J. Ryan, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Alice Jones
*Counsel for Appellee*

Bain & Lauritano, PLC, Glendale
By Amy E. Bain
*Counsel for Appellant*

---

[1]     On the court's own motion, it is ordered amending the caption in this appeal as reflected in this decision.  The above referenced caption shall be used on all further documents filed in this appeal.

---

## MEMORANDUM DECISION

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Randall M. Howe joined.

---

**C R U Z**, Judge:

¶1          Jesus Steve Romero Gomez appeals his convictions and sentences for murder in the first degree, a class 1 felony; conspiracy to commit kidnapping, a class 2 felony; two counts of kidnapping, class 2 felonies; burglary in the first degree, a class 2 felony; and aggravated assault with a deadly weapon, a class 3 felony.  For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2          In the middle of the night in July 2015, B.G. was asleep in her home with her three children, including sixteen-year-old J.B.  Sleeping next to B.G. was U.B., a man B.G. had dated and previously lived with.  B.G. and U.B. were awakened by several men entering the bedroom, pointing guns at them, and commanding them to put their hands up.  One of the men held B.G. on the floor and pointed a gun at her, telling her to keep her head down.  The other men attacked U.B., and B.G. could hear U.B. trying to fight the men off while screaming in pain.  B.G. heard the men strike U.B. with a gun.  The men eventually dragged U.B. out of the bedroom and into the hallway.

¶3          While still in her bedroom, B.G. heard one of the men tell another to grab a pillowcase, and B.G. then heard a gunshot and U.B. cry out in pain.  The men removed U.B. from the home, leaving a trail of blood on the floors and blood spatter on the wall.  Once B.G. heard a vehicle drive off, she felt safe to leave her room, and J.B. called 911.  Officers responded to B.G.'s home and observed the blood throughout the home and into the driveway and street.  Officers located a nine-millimeter bullet inside the wall in the hallway, along with a baseball cap left behind by one of the suspects.  B.G. appeared to be very distraught and afraid.  B.G. and J.B. both told police they were unable to identify the men.  According to B.G., only one of the men did not cover his face or attempt to disguise himself, and she did not recognize him.  Although B.G. claimed she had locked the doors in the house before going to bed, officers observed there was no sign of

forced entry. Officers collected evidence from the scene and opened an investigation. No one saw or heard from U.B. again after that night.

¶4 Meanwhile, the Drug Enforcement Agency ("DEA") was conducting a drug investigation on individuals believed to be trafficking drugs. A confidential informant told DEA agent Brent Coup that a man nicknamed "Seven" was involved in drug trafficking. The confidential informant also told Agent Coup that "Seven" was involved in a homicide that took place in the Glendale area in early July 2015. "Seven" had allegedly shown someone a photo of a dead body on his phone, and "Seven" said that he and several others had murdered the man in the photo and disposed of the body outside of the Phoenix area in the desert. Agent Coup reached out to Glendale detectives to verify whether they had an unsolved homicide occurring around that same time, and Glendale detectives confirmed U.B. had been kidnapped in early July 2015 and was never found. The confidential informant later provided Agent Coup and Glendale detectives with a phone number for "Seven," which turned out to be the phone number of Gomez. The informant confirmed through photo identification that "Seven" was Gomez.

¶5 Shortly after in September 2015, Gomez was arrested by Tolleson police officers after attempting to mail a parcel of marijuana at the post office. Agent Coup was advised of Gomez's arrest, he subsequently advised Glendale police, and Agent Coup and Glendale detectives went to the Tolleson police department. Tolleson officers had obtained a warrant to search, among other things, Gomez's Blackberry smart phone, a flip phone, and a sim card for an unknown phone. Tolleson officers gave Agent Coup custody of the cell phones. While at the Tolleson police department, Agent Coup conducted the search of the cell phones in the presence of Glendale detectives, hoping to find information regarding his drug investigation and the unsolved kidnapping of U.B.

¶6 Officers found text messages from June 2015, shortly before U.B.'s disappearance, in which Gomez was texting a man named Miguel Herrera. The two men appeared to be looking for U.B., and Herrera wrote to Gomez, "I knoo lets go find [U.B.] fukk it." A few days later Gomez texted Herrera, "Yo tex [J.B.] see if [U.B.] there" and "I think he there." About a week later, Gomez texted B.G.'s brother, asking him "U don't know weeere [U.B.] sis live," and again texting "Wtf u can't read [U.B.] the one we looking for." On the night U.B. was kidnapped, Gomez and Herrera exchanged multiple text messages in which Herrera confirmed U.B. was at B.G.'s house, and the two planned to go to B.G.'s house. Finally, officers found texts sent that same evening from a woman named Monique who

wrote, "Honestly I'm so sorry I don't mind yuh asking me for a favor but this I'm basically helping yuh do bad," and again she stated "I could've told you to kick rocks but now I'm helping do bad. So I'm involved." Gomez responded with "stay in the room al get him out." He also asked Monique, "Do u. Have the zip ties."

¶7            The text messages were used by Glendale detectives to obtain additional warrants, phone records, and uncover other persons of interest involved in the disappearance of U.B. Officers reinterviewed J.B., who had previously told them he did not know the men who broke into his home and kidnapped U.B. After officers confronted J.B. with the text messages they found, J.B. admitted Herrera, Gomez, a man named Cesar Cervantes, and a fourth unidentified man kidnapped U.B. Officers discovered Herrera was B.G.'s cousin and Gomez was a family acquaintance. J.B. told police that in the weeks before U.B.'s kidnapping, Herrera and Gomez told J.B. to let them know if U.B. showed up at his house. The night of the kidnapping, J.B. admitted that he told the men U.B. was at his house, sleeping in the bedroom with his mother, B.G. After B.G. and U.B. locked the doors to the house and went to bed, J.B. met the four men outside his house. The four men told J.B. about their plan to take U.B., and they told J.B. to keep the front door to the house unlocked and to stay in his bedroom. J.B. went back into the house, unlocked the doors, and gathered his two siblings into one bedroom to hide. J.B. told officers that the men returned about an hour or two later and kidnapped U.B. J.B. said he did not think that U.B. would be killed.

¶8            Police also located and made contact with Monique. Monique told officers that on the night of U.B.'s kidnapping, she was awakened by someone pounding on the door of her mobile home. When she opened the door, she saw Gomez, whom she was casually dating. Gomez pushed past Monique and entered the home with a few other men she did not recognize. Among the men was an individual who appeared injured and was moaning in pain. Gomez told Monique to go lock herself in her bedroom, and the two began communicating through text while Gomez was in her trailer, which included the texts officers had recovered from Gomez's phone. At one point, Gomez went to the bedroom and asked Monique if she had a blanket, and she gave him a bed sheet. It was at this time that Gomez had also texted Monique and asked her for zip ties, though she told him she did not have any. Gomez took an extension cord from her trailer instead. After Gomez told Monique he had left, she came out of her bedroom and she saw a large puddle of blood on the floor, which she cleaned up. Though it was several months after U.B.'s kidnapping, officers processed Monique's trailer for evidence, and a blood stain was found near her couch.

¶9            U.B.'s body was not found until March 2016.  A man had stopped at an abandoned house in a remote area of Wittmann to gather firewood.  The man noticed what appeared to be a soccer ball lying on the ground, but upon picking it up, he realized it was a human skull.  The man was unable to get a signal to call 911, and drove the skull to the local fire department.  Police officers were notified and took possession of the skull.  The abandoned home was further searched, and officers located several more human bones, a bed sheet, electrical cord, rope, and ammunition.  DNA was obtained from a clavicle bone, and it matched U.B.'s DNA profile.  A forensic anthropologist examined the bones and determined that U.B. suffered injuries around his mouth and shoulder blades at the time of his death.  The forensic anthropologist also found a fracture on U.B.'s ulna, and a gunshot wound in his pelvis that was likely inflicted before his death.  The bedsheet recovered was identified as the bedsheet from Monique's trailer, and blood on it matched U.B.'s DNA profile.

¶10           Gomez was charged with first-degree murder, conspiracy to commit kidnapping, kidnapping, and aggravated assault.   The State brought two alternative theories of first-degree murder: premeditated murder and felony murder.  A jury trial was held, and following the State's presentation of evidence, Gomez moved for acquittal as to premediated murder, which the superior court denied.  Gomez then testified.  Gomez claimed the night of U.B.'s kidnapping, he had been with Cervantes.  Gomez testified he was in Cervantes' car, "nodding" in and out of consciousness, while under the influence of alcohol and Xanax.  Gomez testified that when he awoke, U.B. was suddenly in the back seat of Cervantes' car, moaning in pain and bleeding.  Gomez claimed the text messages to Herrera sent from his phone that evening were from Cervantes, and that Cervantes had been using Gomez's phone while Gomez was sleeping in the car.  When asked about bringing U.B. and the other men to Monique's trailer, Gomez claimed he only did so because he was afraid of the men.

¶11           The jury returned guilty verdicts on all charges, and for each charge the jurors also found an aggravating circumstance, that the offense was dangerous in nature.  For the first-degree murder conviction, the superior court sentenced Gomez to a term of natural life without the possibility of parole.  It sentenced Gomez to seven-and-a-half years for the aggravated assault, and ten-and-a-half years for each of the remaining convictions.

¶12          Gomez timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) and 13-4033(A)(1).

## DISCUSSION

I.      Motion to Suppress

¶13          Before trial, Gomez moved to suppress all evidence obtained from his cell phone, and Gomez contends the superior court erred in denying his motion to suppress. Gomez does not argue the warrant was overbroad, nor does he otherwise challenge its validity. Instead, Gomez argues the officers exceeded the scope of the warrant when searching for evidence related to the homicide, rather than limiting themselves to a search for evidence related to illegal drug trafficking.

¶14          When reviewing the superior court's denial of a motion to suppress, we consider only the evidence presented at the suppression hearing, and view that evidence in a light most favorable to sustaining the court's ruling. *State v. Hausner*, 230 Ariz. 60, 70, ¶ 23 (2012). We review the court's decision "for abuse of discretion if it involves a discretionary issue, but review constitutional issues and purely legal issues de novo." *State v. Booker*, 212 Ariz. 502, 504 ¶ 10 (App. 2006).

¶15          The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Recently, in *Riley v. California*, 573 U.S. 373 (2014), the United States Supreme Court recognized the broad privacy interests implicated by searches of cell phones or other digital devices. Cell phones essentially serve as "minicomputers" holding "a digital record of nearly every aspect of [people's] lives—from the mundane to the intimate," and so a warrant is generally required to search the contents of a cell phone. *Riley*, 573 U.S. at 393-95; 401-03; *see also State v. Peoples*, 240 Ariz. 244, 248-49, ¶¶ 11-16 (2016) (upholding suppression of evidence obtained from a warrantless search of a cell phone).

¶16          In this case, Tolleson police officers obtained a warrant before searching Gomez's cell phone pursuant to a drug investigation. The warrant included as property to be searched, a Blackberry smart phone, a flip phone, and a sim card for an unknown phone. The warrant did not place limitations on the programs, applications, or sites the officers were authorized to search within the phones; it did not limit the type of files that could be removed or copied from the cell phone (photos, videos, text

messages, etc.), or limit the officers' search to files from within a certain timeframe.

¶17        After the first of two search warrants was issued, Agent Coup conducted the search of the cell phones and completed a targeted search of the phone for text messages that took place in June/July 2015, around the time of U.B.'s kidnapping.  While Agent Coup admitted to intentionally searching the phone for evidence related to the homicide, he also testified that his primary focus in his search of the phone was for evidence related to the drug investigation.  However, Gomez contends the agent's subjective intent to also uncover evidence about the homicide, unrelated to the drug investigation, requires the murder evidence discovered be suppressed.

¶18        Under the plain view doctrine, while officers are executing a search warrant, and "[a]s long as the warrant authorized them to be where they were, the police could seize any items that were in plain view, the evidentiary value of which was immediately apparent."  *State v. Apelt*, 176 Ariz. 349, 362 (1993).  It does not matter whether the officers intended to uncover evidence related to the homicide while searching the cell phone:

> [E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.  The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.

*Horton v. California*, 496 U.S. 128, 138-39 (1990); *see also State v. DeCamp*, 197 Ariz. 36, 40, ¶ 20 (App. 1999) (finding it is not required that officers inadvertently find evidence not included in the warrant that is within plain view); *United States v. Ewain*, 88 F.3d 689, 692-94 (9th Cir. 1996) (finding "[t]he officers' subjective good faith [was] not the determinant of whether the evidence in plain view should be suppressed," even though officers intentionally searched for evidence not included in the warrant).

¶19        Regardless of the officers' intent, they discovered the text messages related to U.B.'s kidnapping and murder during a lawful search of the cell phone as authorized by a valid warrant.  The warrant placed no limitation as to the areas where the officers could search within the phone or the time frame that could be searched.  Upon discovering the messages, the officers immediately recognized that they constituted incriminating

evidence. The search was authorized by the warrant, and the seizure of text messages related to the homicide was authorized by the plain view doctrine. *See Horton*, 496 U.S. at 142.

¶20 Gomez contends that given the unique nature of electronic data, the plain view doctrine should not apply to cell phones. However, Gomez does not make any persuasive arguments as to why the plain view doctrine cannot apply to the search of cell phones and electronic information and how extending the doctrine to this case would unconstitutionally violate his privacy interests. "Because the officers looked only where they could properly look under the terms of a particularized and proper search warrant, [Gomez's] privacy was no more impaired than it would have been had they expected to find only the things specified in the warrant." *See Ewain*, 88 F.3d at 694. Further, it would be absurd to require officers, who are legally authorized by a search warrant to search a suspect's text messages, to ignore evidence of additional crimes while searching for messages that contain evidence of a particular crime under investigation, as Gomez proposes. Given the overlap in the time period of the murder of U.B. and Agent Coup's drug investigation, it was inevitable that officers would have eventually read the incriminating messages that took place in the weeks before, and night of, U.B.'s kidnapping.

¶21 The superior court did not err in denying Gomez's motion to suppress.

II.     Motion for a Judgment of Acquittal

¶22 Gomez also argues the superior court erred in denying his motion for a judgment of acquittal as to premeditated murder. Pursuant to Arizona Rule of Criminal Procedure ("Rule") 20, "[a]fter the close of evidence on either side, and on motion or on its own, the court must enter a judgment of acquittal on any offense charged in an indictment, information, or complaint if there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). We review de novo a superior court's denial of a Rule 20 motion, viewing the evidence in a light most favorable to sustaining the verdict. *State v. Bible*, 175 Ariz. 549, 595 (1993); *see also State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011).

¶23 The State offered alternative theories on which the jury could find Gomez guilty of first-degree murder: premeditated murder and felony murder. *See* A.R.S. § 13-1105(A)(1)-(2). The jury unanimously found Gomez guilty of felony murder, and only three jurors also found Gomez

guilty of premediated murder. Gomez does not challenge his murder conviction under the alternative theory of felony murder, which does not require a finding of premeditation. Therefore, we need not consider whether the State presented sufficient evidence of premeditation to affirm the conviction of first-degree murder. *See State v. Smith*, 193 Ariz. 452, 460, ¶ 36 (1999); *State v. Martinez*, 218 Ariz. 421, 427, ¶ 22 (2008).

## CONCLUSION

**¶24**         For the foregoing reasons, we affirm Gomez's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:    AA