March 3, 2021

**Supreme Court**

No. 2019-136-C.A.
(P1/14-1A)

State                    :

v.                       :

Jorge Depina.            :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State        :

v.        :

Jorge Depina.        :

Present:  Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ.

## O P I N I O N

**Justice Robinson, for the Court.**  The defendant, Jorge Depina, appeals from an October 15, 2018 judgment of conviction and commitment[1] entered in Providence County Superior Court which reflected the fact that he was found guilty by a jury of second-degree murder in the death of his daughter, Aleida, and was sentenced to life imprisonment.  On appeal, Mr. Depina contends that "the trial justice erred when she denied Mr. Depina's motion to suppress the videos located on a Samsung digital

---

[1]     Mr. Depina's notice of appeal states that he is appealing from a May 16, 2018 judgment.  However, the judgment of conviction and commitment was not actually entered until October 15, 2018.

camera that detectives seized by improperly expanding the scope of a judicially-approved warrant."

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

On January 2, 2014, Mr. Depina was indicted by a Grand Jury on one count of murder, in violation of G.L. 1956 §§ 11-23-1 and 11-23-2, for the July 3, 2013 death of his daughter.  Immediately following the death of Mr. Depina's daughter, police officers executed two searches of his home pursuant to validly issued warrants.

The first search warrant was issued on July 3, 2013 (the first warrant)[2] and permitted the search of Mr. Depina's residence at 48 Knowles Street, First Floor, Pawtucket, Rhode Island, for "[b]lood, semen, vomit, blankets, bedding, clothing, towels, rags, cloths, ropes, ties, phones, trash, or any items believed associated with a homicide."  A search ensued.  A second search warrant was obtained on July 5, 2013 (the second warrant), following the autopsy of the victim (*see infra*), and it

---

[2]     The testimony at the suppression hearing reveals that there was some uncertainty as to whether this search warrant was signed on July 3, 2013 or in the early morning hours of July 4, 2013.  The warrant is dated July 3, 2013, so we shall refer to it as such.

permitted a search of the same residence for "[u]tensils, cooking instruments, heating elements, or items, any metal items, plastic items, or hard items, anything that may be used to swing or strike, or tie, hold, bind, any items with blood, semen, vomit on them or other items believed associated with pain, an assault, child abuse, or homicide[.]"  It is undisputed that, during the second search, the police seized the evidence at issue in this appeal, a Samsung camera.

On October 28, 2013, the police laudably sought and were issued a third warrant to search the contents of the camera (the third warrant); the third warrant specifically permitted a search for "[i]mages and/or videos from PNY memory card from Samsung WB15OF camera."[3]

On December 22, 2017, Mr. Depina moved to suppress all tangible evidence seized by the police, including the Samsung camera and its contents (those being the only items with which we are concerned in this appeal); he averred that the evidence "was obtained in violation of the Fourth Amendment of the United States Constitution as well as Article I, Section 6 of the Rhode Island Constitution."

Pretrial motions were heard over five days in January of 2018, the majority of which consisted of motions to suppress.  We relate below the salient aspects of what transpired at those hearings.

---

[3]     Although it is not relevant to the issue before the Court, it is worth noting that a fourth warrant was later obtained authorizing the search of the contents of a computer which had also been seized.

## A

### The Testimony of Detective Donti Rosciti

Detective Donti Rosciti testified that, at the time of the hearing, he was employed as a patrol officer for the North Providence Police Department, but that, at the times relevant to this action, he was employed as a detective in the Major Crime Unit of the Pawtucket Police Department.[4] He further testified that Detective David Silva was his partner. It was his testimony that he and Det. Silva responded to the Miriam Hospital around 5:30 p.m. on July 3, 2013 in response to a report of a deceased ten-year-old female. He stated that the initial responding officer told the detectives that Mr. Depina had entered the hospital with Aleida, that Aleida had "no vital signs," and that Mr. Depina told the officer that he had been alone with his daughter at their home for the previous twenty-four hours. Detective Rosciti testified that it was determined that Mr. Depina and Aleida resided on the first floor of 48 Knowles Street in Pawtucket.

It was further Det. Rosciti's testimony that he had an opportunity to view Aleida's body at the hospital before the cause of death was determined and that he observed "extensive bruising on many, many areas of her body, her legs, her back;" as well as "burn marks" and what he thought at the time were "whip marks."

---

[4] It was Det. Rosciti's testimony that he eventually retired from the Pawtucket Police Department after twenty-one years of service. For the purposes of this opinion, we shall refer to him as Detective Rosciti, rather than Patrol Officer Rosciti.

Detective Rosciti testified that, after he had an initial discussion with Mr. Depina at the police station, he sought a warrant to search Mr. Depina's home (the first warrant). He added that a search of that property then took place, starting at approximately 3:40 a.m. on July 4, 2013. It was his testimony that thereafter, on July 5, 2013, Det. Silva attended the autopsy and that he subsequently told Det. Rosciti that they "were looking for certain particular items or devices that would have been used to hit, strike, whip Aleida."

Detective Rosciti stated that he then obtained "a second search warrant with the probable cause for entry into 48 Knowles Street." It was his testimony that a second search of that property ensued. Specifically, he testified that a Samsung camera was seized from the bedroom of Mr. Depina during the second search; he added that it was "located on the dresser * * *." He also testified that the camera was thereafter kept in the evidence room at the Pawtucket Police Department.

It was further Det. Rosciti's testimony that, on October 25, 2013, during an "evidence viewing," it was determined that the police had never examined the contents of the camera. He stated that yet another search warrant was then sought to examine the contents of the camera and that it was issued on October 28, 2013. It was further his testimony that some of the relevant contents of the camera were then played for him, Det. Silva, and an Assistant Attorney General.

On cross-examination, Det. Rosciti testified that he prepared both the July 3 and the July 5 warrants (the first and second warrants). He testified on cross-examination that he observed the camera on a dresser during the first search, but he added that it was not seized until the second search. He acknowledged that he did not observe "any marks or indentations or scratches" on the camera before it was seized. He also acknowledged on cross-examination that, in addition to the camera, the police seized items including the following during the second search: a "round wood stick;" a baseball bat; four belts; two hair clippers; an extension cord; "two white cords;" a jump rope; a bike chain; a nutcracker; a hammer; silver tongs; a black bucket; two green extension cords; a curtain rod; an "HP laptop;" and a report card.

On cross-examination, Det. Rosciti further stated as follows with respect to the camera:

> "I noticed it. I looked at it. It fit all the criteria that the medical examiner said, 'Metal, plastic, strap.' You certainly could swing it, jab somebody with it, hit somebody with it. And they were round injuries on her body. I think it fit a host of different reasons to seize it."

He acknowledged that, to his knowledge, no one requested that the Department of Health examine the camera for blood or trace evidence, nor did anyone bring the camera to the medical examiner to determine if it might have caused any of Aleida's injuries. Lastly, he further acknowledged that there were various other items at the

residence that were not seized but which could be characterized as plastic items or items with a cord.

**B**

**The Testimony of Detective David Silva**

Detective Silva testified that he was, at the times at issue in this case as well as at the time of the hearing, a detective in the Major Crime Unit of the Pawtucket Police Department. His testimony was largely consistent with that of Det. Rosciti. Therefore, we shall provide only the salient aspects of that testimony.

Detective Silva testified that, subsequent to the first search of Mr. Depina's home, he attended the July 5 autopsy. He added that the medical examiner told him that Aleida's manner of death was "homicide caused by blunt force trauma" and that Aleida had a "perforation of her small intestine." He further testified that, "out of an abundance of caution," he told Det. Rosciti that they needed a second search warrant "to look for items that would have been used to cause her injuries." He stated that, when the police officers arrived to execute the second search warrant, the home was in the same condition as they had left it after the first search. He added that the evidence room at the Pawtucket Police Department, where the camera was eventually stored, was "secured" and monitored by video.

It was Det. Silva's testimony that he prepared the third warrant to search the contents of the camera; he added that in doing so he opened a "side compartment"

of the camera to "allow the memory card to be released" so that he could document the type of memory card and, if applicable, include the serial number in the warrant. He testified that he did not turn the camera on. He further testified that seven videos that were relevant to the case were discovered during the search of the camera.

On cross-examination, Det. Silva testified that the second warrant was specific to items that could have caused the physical injuries to Aleida. He also acknowledged that some of the items seized in the second search were not weapons, but he stated that he believed that the camera was within the scope of the second warrant. He further testified on cross-examination that the medical examiner told him that "when you're looking for items to think outside of the box[,] [d]on't look for just traditional items that you would use to hit * * *."

It was further Det. Silva's testimony on cross-examination that the camera was not "forensically inspected," but that other items seized in the second search were sent to the Department of Health to be tested for bodily fluids and DNA. He also stated on cross-examination that, after obtaining the third warrant, the officers viewed photos as well as videos recovered from the camera.

Upon the completion of the testimony at the suppression hearing relevant to whether or not the camera and its contents should be suppressed, the trial justice heard argument from counsel and then issued a bench decision denying the motion to suppress. *See infra.* A jury trial ultimately ensued over eleven days in March and

April of 2018. Mr. Depina was found guilty by the jury of second-degree murder, and the trial justice sentenced him to life imprisonment. Mr. Depina appealed to this Court.[5]

## II

### Standard of Review

We have stated that "[w]hen reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Storey*, 8 A.3d 454, 459-60 (R.I. 2010) (quoting *State v. Flores*, 996 A.2d 156, 160 (R.I. 2010)). "We will, however, conduct a *de novo* review of the record and independently consider whether a defendant's rights have been violated." *State v. Parra*, 941 A.2d 799, 803 (R.I. 2007); *see also State v. Casas*, 900 A.2d 1120, 1129 (R.I. 2006) (stating that, when conducting a review of a decision denying a motion to suppress, "we are required to make an independent examination of the record to determine if [the defendant's] rights have been violated") (internal quotation marks omitted). "Moreover, when performing [our] independent examination, this Court must view the evidence in the

---

[5]     Mr. Depina filed his notice of appeal prior to the entry of the judgment of conviction and commitment in this case. Although his notice of appeal was filed prematurely, we shall treat it as though it had been timely filed. *See Hexagon Holdings, Inc. v. Carlisle Syntec Inc.*, 199 A.3d 1034, 1038 n.3 (R.I. 2019) ("[T]his Court will treat [a] premature appeal as if it had been timely filed.") (internal quotation marks omitted).

record in the light most favorable to the state." *State v. Gonzalez*, 136 A.3d 1131, 1145 (R.I. 2016) (internal quotation marks omitted). Accordingly, "we will reverse a trial justice's findings on a motion to suppress only if (1) his or her findings * * * reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *Id.* (internal quotation marks omitted).

We have also stated that "[w]ith respect to questions of law and mixed questions of law and fact involving constitutional issues * * * this Court engages in a *de novo* review * * *." *State v. Barkmeyer*, 949 A.2d 984, 995 (R.I. 2008) (internal quotation marks omitted).

## III

## Analysis

### A

### The Trial Justice's Decision

The trial justice began her decision on the motion to suppress the camera and its contents by noting that the Fourth Amendment requires that a warrant "particularly describe the persons or things to be seized." She stated that, in considering the motion before her, she was tasked with determining whether or not the seizure of the camera went beyond the scope of the second warrant. The trial justice then proceeded to look at the four corners of the second warrant; she reviewed

the exact language of the warrant and the testimony of the two detectives at the suppression hearing.

Importantly, the trial justice pointed out in the course of her decision that she had the camera at issue "in hand." She stated that it was not "lightweight plastic," but that it was either metal or "exceptionally hard plastic." She further characterized it as "a pretty heavy piece of equipment" that did "indeed have a wristband, wrist string, that can indeed be swung around." The trial justice also remarked that the camera "if swung could indeed cause pretty serious pain, and it could cause abuse, and it probably could cause pretty serious injury." She added that the camera was "a lot heavier than described," although it was small.

The trial justice also stated that the fact that the camera was not sent for "scientific testing" was "negate[d]" by the testimony of the detective "that it was seized, at least in significant part, because it would likely have served as a weapon and could be swung around and whack somebody with it."

She specifically stated that Det. Silva's testimony that the medical examiner told him to think outside of the box as to possible weapons was instructive. She added that she found it compelling that the police seized the camera but did not do anything with it immediately; she reasoned that, if the police had seized the camera in order to view its contents rather than because they believed it could have been used as a weapon, they would not have waited so long to view its contents.

The trial justice opined that she found credible the version of events whereby the police had not looked at the camera or examined the memory card and its contents before October 28, 2013. She then stated as follows:

> "I am very cognizant of the requirement that you can't have a general warrant, and you can't take what you have not specified because that's tantamount to a warrantless search and inconsistent with the Fourth Amendment and applicable case law, but I don't find that's what occurred here with this particular item of evidence. So the motion to suppress the camera is denied * * *."

**B**

**Discussion**

Mr. Depina contends on appeal that the trial justice erred in denying his motion to suppress the camera and its contents because, in his opinion, the police improperly expanded the scope of the second warrant. He claims that "the camera clearly fell outside the warrant's scope" since it is "a delicate piece of electronic equipment that can easily fit in the palm of one's hand * * *." According to Mr. Depina, the camera could not have caused the injuries noted by the medical examiner; in his reply brief, he adds that "*no* rational person would view the small camera with a wristlet-style string as a probable—or even possible—choice for the type of repeat-use weapon the judge had authorized the officers to seize." (Emphasis in original.) He further avers that "[b]y ignoring [the warrant's] parameters * * * the detectives committed a constitutional violation."

- 12 -

In support of his argument on appeal, Mr. Depina points to Det. Rosciti's testimony that he did not see any indentations, scratches, blood, hair, or fibers on the camera and to the fact that the camera was never sent for forensic examination. He further posits that the seizure of a laptop, bucket, and report card are indicative of the fact that the "police officers were not bothering to confine themselves to the judicial dictates of the second warrant." He contends that the police should have obtained another warrant for the camera before seizing it.

The Fourth Amendment to the United States Constitution "declares that the right to be secure against unreasonable searches shall not be violated, and it further declares that: No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."[6] *Marron v. United States*, 275 U.S. 192, 195 (1927) (internal quotation marks omitted); *see State v. Joseph*, 114 R.I. 596, 599, 337 A.2d 523, 525 (1975) ("The constitutional interdiction is not against all searches and seizures, but only those that are unreasonable."); *see also State v. Pratt*, 641 A.2d 732, 736 (R.I. 1994).

---

[6] The Rhode Island Constitution likewise "mandates that a warrant describ[e] as nearly as may be, the place to be searched and the persons or things to be seized." *State v. Rose*, 748 A.2d 1283, 1285 (R.I. 2000) (quoting article 1, section 6 of the Rhode Island Constitution).

"General searches have long been deemed to violate fundamental rights." *Marron*, 275 U.S. at 195. The United States Supreme Court has definitively stated: "It is plain that the [Fourth] amendment forbids them." *Id.* "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Id.* at 196; *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976).

If, in a given case, "the scope of a search exceeds that permitted by the terms of a valid warrant, the subsequent seizure is unconstitutional." *United States v. Hamie*, 165 F.3d 80, 82 (1st Cir. 1999); *see Horton v. California*, 496 U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant * * * the subsequent seizure is unconstitutional without more."); *see also United States v. Ewain*, 88 F.3d 689, 693 (9th Cir. 1996).

It is important to note initially that there is no allegation in this case that the second warrant was without probable cause. Mr. Depina himself in his brief before this Court describes it as "facially valid * * *." In addition, there is no allegation that the second warrant impermissibly authorized a general search; indeed, Mr. Depina in his brief describes the second warrant as "striking i[n] its precision."

- 14 -

The only narrow issue with which this Court is confronted in this case is whether or not, in seizing the camera, the police exceeded the scope of the second warrant. In order to make that assessment we must look to the precise language of the second warrant itself.

The second warrant allowed for the search of the first floor of 48 Knowles Street for "[u]tensils, cooking instruments, heating elements, or items, any metal items, plastic items, or hard items, anything that may be used to swing or strike, or tie, hold, bind, any items with blood, semen, vomit on them or other items believed associated with pain, an assault, child abuse, or homicide[.]" At the suppression hearing, the trial justice had the camera at issue in hand[7] when she determined that it fell within the just-quoted language. The trial justice found the camera to be "metal" or "hard plastic;" she also stated that it was a "heavy compact piece of equipment" which could be swung to inflict "serious pain * * *." It is plain that the trial justice did not commit clear error in finding that the camera was a hard item made of either metal or plastic or in concluding that its wrist strap could be used to swing the camera and inflict abuse on a child. Indeed, Det. Rosciti testified that the camera "fit all the criteria" of the medical examiner, and Det. Silva testified that the police officers were told to look "outside of the box" for possible weapons that could

---

[7] The camera was marked as a full exhibit for the purpose of the suppression hearing.

- 15 -

have been used to abuse Aleida. We are entirely unable to perceive clear error in the trial justice's factual findings with respect to the camera. *See Storey*, 8 A.3d at 459-60.

Moreover, in the opinion of this Court, the language of the second warrant is clear and unambiguous—"any metal items, plastic items, or hard items, anything that may be used to swing or strike * * *." In our judgment, it was not error for the trial justice to determine that, based on her factual findings with respect to the camera, it fell within the dictates of the second warrant. *See United States v. Fagan*, 577 F.3d 10, 13 (1st Cir. 2009) ("[I]n all events, search warrants must be read in a practical, common-sense manner[;] * * * [they] should be viewed through a real-world prism and interpreted in a realistic fashion.") (internal quotation marks omitted). What is more, it is our opinion that it was certainly reasonable for the detectives to have believed that the camera fell within the terms of the second warrant since the camera is clearly a hard, metal or plastic item which could be swung to inflict injury.

We are not dissuaded from our conclusion that the camera very clearly fits within the language of the second warrant by the fact that Det. Rosciti did not observe any indentations, scratches, or trace evidence on the camera when seizing it, nor by the fact that it was ultimately not forensically tested. There is nothing about the camera itself or the record presented to this Court which could lead us to

the conclusion which Mr. Depina seeks—*viz.*, that no rational person could have found the camera to be a possible choice for the type of weapon the police officers were seeking. Indeed, we are ineluctably led to the opposite conclusion.[8]

Accordingly, in our judgment, the trial justice did not commit clear error in her factual determinations which led to her denial of Mr. Depina's motion to suppress the camera and its contents, and we are unable to perceive any violation of Mr. Depina's constitutional rights with respect to the admission of that evidence. *See Gonzalez*, 136 A.3d at 1145; *Storey*, 8 A.3d at 459-60.

## IV

## Conclusion

Accordingly, we affirm the judgment of the Superior Court. We remand the record to that tribunal.

Justice Flaherty participated in the decision but retired prior to its publication.

Justice Lynch Prata and Justice Long did not participate.

---

[8] We deem it important to note that the detectives commendably applied for a third warrant for the contents of the camera before viewing those contents.



**STATE OF RHODE ISLAND**

**SUPREME COURT – CLERK'S OFFICE**
Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Jorge Depina. |
| **Case Number** | No. 2019-136-C.A. (P1/14-1A) |
| **Date Opinion Filed** | March 3, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, and Robinson, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State: <br><br> Owen Murphy <br> Department of Attorney General <br><br> For Defendant: <br><br> Angela M. Yingling <br> Office of the Public Defender |